Hugh Frank POTTS, Roy A. Godfrey and
Ernest O'Hearn, Jr.,

v.

The UNITED STATES.

No. 50051.

United States Court of Claims.

Nov. 30, 1954.

Charles R. Nesbitt, Oklahoma City, Okl., for plaintiffs. Reuel W. Little, Madill, Okl., was on the briefs.

Howard O. Sigmond, Washington, D. C., with whom was Asst. Atty. Gen. Perry W. Morton, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

WHITAKER, Judge.

The construction of the Denison Dam and Reservoir on the Red River flooded the following described property:

NW¼ of the SE¼, Section 20, Township 6 South, Range 7 East, Marshall County, Oklahoma, containing 40 acres, more or less.

Plaintiff Hugh Frank Potts had an oil and gas lease on it, and he sues for a taking.

On December 30, 1941, in anticipation of the flooding of these lands, defendant purchased them from John Marshall, but prior to the purchase, he had executed an oil and gas lease to Colbert H. Marshall, which was assigned by him to plaintiff Hugh Frank Potts on September 8, 1942.

In 1950 Potts assigned the lease to plaintiffs, Roy A. Godfrey and Ernest O'Hearn, for a consideration of $42,000, and they also sue for a taking.

Defendant admits the taking; the question presented is, what is just compensation and who is entitled to recover it.

The pertinent facts presented to us can be briefly stated. On January 25, 1945, plaintiff Potts entered into a contract with the Bryan Petroleum Corporation of Tulsa, Oklahoma, for the drilling of an oil well on the land described. It was estimated that the well could be completed within 60 to 75 days. On February 9, 1945, drilling was commenced at a site at the approximate center of the property, which had an elevation of 610 feet. At this time the level of the lake was approximately 603 feet.

Prior to the commencement of drilling, Potts asked the Army engineers at Denison, Texas and Tulsa, Oklahoma, when it was expected that the level of the lake would reach 610 feet. From what the engineers told him and other investigation made by him, he concluded that the lake would not reach this elevation until 90 days after drilling operations had commenced or probably later.

His estimate, however, proved to be wrong. On March 15, 1945, due to unexpected heavy rainfall, the lake reached an elevation of 617 feet. But even prior thereto seepage from the encroaching waters caused the drilling machinery to bog down, and drilling operations were abandoned by the Bryan Petroleum Corporation on February 27, 1945, as it had a right to do under its contract with plaintiff. At this time the well had been sunk about one-fourth of its expected depth.

Later, plaintiff caused to be erected above the surface of the waters a platform to support the drilling machinery, and an oil well was drilled in the bottom of the lake at another site.

■ In the case of a taking, the measure of just compensation is the difference in the market value of the property taken before and after the taking. For parallel examples, see Vandiver v. United States, 67 Ct.Cl. 125; 11,000 Acres of Land, More or Less, Situated in Smith County, Tex. v. United States, 5 Cir., 152 F.2d 566, 568, certiorari denied 328 U.S. 835, 66 S.Ct. 980, 90 L.Ed. 1611.

■ Since in 1945 there were no sales of gas and oil leases in the area here concerned upon which a market value at or near the time of taking could be established, resort must be had to other factors. United States v. Miller, 317 U.S. 369, 374, 63 S.Ct. 276, 87 L.Ed. 336. See also American-Hawaiian Steamship Co. v. United States, Ct.Cl., 124 F.Supp. 378.

Expert testimony has been introduced to show the difference in market value of the leasehold here involved before and after inundation. Our task is to evaluate this testimony and to arrive at a figure which in our judgment represents just compensation.

Defendant's witness C. V. Sidwell testified that plaintiff Potts' lease was worth $240,000 before the inundation, and $200,000 thereafter, a difference of $40,000. Sidwell is a graduate geologist and the head of the Department of Petroleum Production at the University of Tulsa, Oklahoma. He had had extensive experience as a consultant for major oil companies and for the United States.

Plaintiffs' witness, O. H. Hill, was a consulting petroleum geologist with experience in the valuation of leasehold estates. He valued the lease before the inundation at only $200,000, as against Sidwell's valuation of $240,000. However, after inundation he valued the leasehold at only $20,000. But this must be considered in the light of the fact that after five years of extraction of oil, plain-

tiffs Godfrey and O'Hearn paid $42,000 for it. Again, his valuation of $20,000 is to be compared with Sidwell's figure of $200,000. Anyway, Hill said the difference in market value before and after inundation was $180,000.

Another of plaintiffs' witnesses, Ed J. Kubat, a successful, independent Oklahoma oil operator, put the highest valuation of all on the lease before inundation, except the plaintiffs themselves. He valued it at $300,000, as against Hill's valuation of $200,000, and Sidwell's valuation of $240,000. But he did not place a value on it after inundation.

As might be expected, the testimony of plaintiffs, Potts and Godfrey, placed the difference before and after inundation at a much larger figure than any of the experts.

There is thus a wide variation in the testimony of the experts. How shall we evaluate their testimony?

The following is of some assistance. The proof shows that it would cost about $50,000 more to drill a well after the lands had been flooded than it would cost to drill it on dry land. The proof also shows that it would cost about $1,000 a year to operate a well sunk through the waters of the lake over what it would cost to operate one on dry land.

In addition, since the cost of operation was greater after inundation than it was before, it would have become unprofitable to continue drilling earlier after inundation than it would have before inundation.

Drilling operations were stopped in 1952, at which time the well was producing only 7 barrels of oil a day. At that time it was thought that the salvage value of the pipe in the well would be greater than the profit from further operation. But had the lands not been flooded, the well could have been operated profitably for some longer time. However, the proof is quite indefinite as to how long the well could have been operated profitably, or what the profit would have been.

Plaintiff Potts also asks us to take into account the cost of relocating his well, after that well started on dry land had been inundated. Potts started the dry land operation without any assurance that the land would not be flooded before the well could be sunk to the required depth. He took the risk of completing the drilling before inundation. Had he deferred drilling operations until the maximum water level had been reached, the cost of relocating the well would not have been incurred.

Because of the inundation of these lands plaintiffs have been forced to spend an amount of money more than they would have spent otherwise, and they may have been deprived of some additional profit that could have been realized from further drilling on dry land.

This is about all there is to aid us in evaluating the expert testimony, aside from the character, experience, and qualifications of the witnesses.

Taking all the above into consideration, we are of the opinion that $75,000 would fairly compensate plaintiff Potts for the taking of his mineral rights.

We are of the opinion that neither Godfrey nor O'Hearn is entitled to recover. It is the owner at the time of the taking who is to be compensated. Danforth v. United States, 308 U.S. 271, 284, 60 S.Ct. 231, 84 L.Ed. 240. They took an assignment of the lease from plaintiff Potts in 1950, after the lands had been submerged to a depth of from 30 to 35 feet. They paid $42,000 for the assignment. After that time the defendant did nothing to impair the value of what they had purchased.

They are not, of course, entitled to recover anything on account of the impairment of the mineral rights while Potts owned them. Whatever claim Potts may have had against the Government for this, he could not validly assign to anybody. Assignment of Claims Act of 1940, 54 Stat. 1029, 31 U.S.C.A. § 203; United States v. Shannon, 342 U.S. 288, 72 S.Ct. 281, 286, 96 L.Ed. 321.

Only one more thing needs to be said. Plaintiffs say that after the lifting of the orders of the Petroleum Administration the regulations permitted Godfrey and O'Hearn to drill a second well on the 40-acre tract, and that they in fact did drill a second well, and that we must take into account the extra cost of drilling this second well, and the extra cost of its operation. Aside from the fact that our problem is to determine the difference in the value before and after the taking, and not the extra costs to which plaintiffs have been put, we do not think we should take into consideration a situation arising after the taking. Compensation for a taking must be determined as of the time and place of taking. United States v. New River Collieries, 262 U.S. 341, 344, 43 S.Ct. 565, 67 L.Ed. 1014; Davis v. Newton Coal Co., 267 U.S. 292, 301, 45 S.Ct. 305, 69 L.Ed. 617; Brooks-Scanlon Corp. v. United States, 265 U.S. 106, 44 S.Ct. 471, 68 L.Ed. 934; United States v. Toronto, Hamilton & Buffalo Navigation Co., 338 U.S. 396, 404, 70 S.Ct. 217, 94 L.Ed. 195. At the time of the taking, the regulations permitted the drilling of but one well on a 40-acre tract. We think it is not in order to take into account the extra costs of drilling and operating the additional well.

Not only is this true, but this additional well was drilled by plaintiffs, Godfrey and O'Hearn, and, as we stated above, at the time they acquired this lease, for the consideration of $42,000, the lands had already been flooded, and after they acquired the lease defendant did nothing to impair the value of what they had purchased.

When they acquired the lease for $42,000 they no doubt took into consideration the possibility they might be permitted later on to drill an additional well.

On the whole case, we are of the opinion that just compensation to plaintiff Hugh Frank Potts is the sum of $75,000. Judgment will be entered for this amount, together with interest at 4 per cent per annum on that sum from March 15, 1945, to date of payment, not as interest but as a part of just compensation.

Plaintiffs Roy A. Godfrey and Ernest O'Hearn are not entitled to recover, and the petition insofar as they are concerned is dismissed.

It is so ordered.

JONES, Chief Judge, and LARAMORE and LITTLETON, Judges, concur.

MADDEN, Judge (dissenting in part).

I think the court is wrong in failing to consider the additional cost of drilling a second well on the 40-acre tract as an element of the loss caused to the plaintiff Potts by the flooding of the land. The taking here involved occurred about March 15, 1945. At that time Petroleum Administrator for War Order No. M–68 was in effect, which limited the drilling of wells in geological structures such as those here present, to 40-acre spacing. The order was a war measure, based on a critical shortage of materials used in drilling and equipping wells. No one expected the order to remain in effect permanently. The owner of the lease, or one who contemplated purchasing the lease, would expect that, when the shortage of materials had disappeared, normal spacing would be resumed. It was in fact resumed on March 7, 1946, when the Corporation Commission of Oklahoma issued a 20-acre spacing order.

At the time of the taking, the owner of the lease, or one who was considering the purchase of it, would not be thinking only of what he could do with the land that day, or that year. He would be thinking of the normal development of the land, in which a second well might not be drilled for years, if ever, after the first one. What a willing buyer would give a willing seller for an oil lease, at the time and place, would be affected hardly at all by a temporary restriction upon the number of wells which could be drilled.