UNITED STATES *v.* VIRGINIA ELECTRIC &
POWER CO.

No. 49. Argued November 10, 1960.—Decided April 3, 1961.

*Assistant Attorney General Morton* argued the cause
for the United States. With him on the brief were *Solicitor General Rankin, Roger P. Marquis* and *Harold S.
Harrison.*

*Ralph H. Ferrell, Jr.* argued the cause for respondent.
With him on the brief were *George D. Gibson* and *Francis
V. Lowden, Jr.*

MR. JUSTICE STEWART delivered the opinion of the
Court.

In 1944 Congress authorized the construction of a dam
and reservoir on the Roanoke River in Virginia and North
Carolina. For purposes of that project the Government

acquired by condemnation a flowage easement over 1840 acres of fast lands adjacent to the Dan River, a navigable tributary of the Roanoke. This 1840-acre tract was part of a 7400-acre estate. The respondent owned a perpetual and exclusive flowage easement over 1540 acres within the easement taken by the Government. The only question presented by this case concerns the compensation awarded to the respondent for the destruction of its easement.

The respondent's easement had been purchased from the owner of the estate and had been conveyed to the respondent's predecessors in title by various deeds over a period of many years, beginning in 1907. Along with the easement the fee owner had also expressly granted by deed the release of all claims for damage to the residue of the estate resulting from the exercise of rights under the easement.

In 1951, after extended negotiations, the owner of the estate agreed to convey to the Government a flowage easement over the 1840-acre tract in return for the payment of one dollar.[1] This agreement was expressly made subject to "such water, flowage, riparian and other rights, if any," as the respondent owned in the tract. The agreement also provided that the Government could elect to acquire its easement by a condemnation proceeding, in which event the agreed consideration of one dollar would be "the full amount of the award of just compensation inclusive of interest." Exercising this election, the Government instituted condemnation proceedings in the District Court to acquire a flowage easement over the 1840 acres in question, depositing one dollar as the estimated just compensation for the property to be taken.

---

[1] The record indicates that the owner was willing to accept this nominal amount because of her interest in developing the balance of the estate as a wild game preserve, a use which presumably would be enhanced by a contiguous artificial lake.

The fee owner acknowledged the settlement contract previously made and agreed to the one dollar compensation. The respondent, whose easement was to be destroyed, intervened in the proceedings to contest "the issue of just compensation."

The District Court made a substantial award to the respondent as compensation for the taking of its flowage easement. The judgment was affirmed by the Court of Appeals for the Fourth Circuit, on the authority of that court's decision in *United States* v. *Twin City Power Co.*, 215 F. 2d 592. 218 F. 2d 524. After the judgment in the *Twin City* case was reversed by this Court, 350 U. S. 222, we vacated the judgment in this litigation and remanded the case to the Court of Appeals for further consideration in the light of our *Twin City* decision. 350 U. S. 956. The Court of Appeals in turn remanded the case to the District Court with instructions that, in computing the amount of compensation to be awarded for the taking of the respondent's easement, there should be eliminated "any element of value arising from the availability of the land for water power purposes due to its being situate on a navigable stream." 235 F. 2d 327, 330, rehearing denied 237 F. 2d 165.

On remand the District Court proceeded in accordance with these directions. Commissioners were appointed and given detailed instructions to follow in computing the compensation to be awarded the respondent. These instructions included an explicit direction to exclude from the computation any element of value arising from the availability of the land for water power purposes attributable to its location on a navigable stream.[2] The Commissioners found that, under the criteria imposed by the

---

[2] The detailed instructions were otherwise based upon a traditional method of valuing what the Government appropriated, *i. e.*, the difference in the value of the servient land before and after the Government's easement was imposed.

court, the value of the respondent's easement was $65,520. The district judge accepted these findings, and in accordance with them awarded the respondent that sum. On appeal the judgment was affirmed. 270 F. 2d 707.

We granted certiorari to consider the Government's claim that the respondent's easement had no compensable value when appropriated by the United States. 362 U. S. 947. For the reasons that follow we reject that argument in the extreme form it has been presented, but we have concluded that the judgment must nonetheless be set aside for a redetermination of the compensation award.

It is indisputable, as the Government acknowledges, that a flowage easement is "property" within the meaning of the Fifth Amendment. See *United States* v. *Welch,* 217 U. S. 333; *Panhandle Co.* v. *Highway Comm'n,* 294 U. S. 613, 618; *Western Union Tel. Co.* v. *Penn. R. Co.,* 195 U. S. 540, 570. Similarly, there can be no question that the Government's destruction of that easement would ordinarily constitute a taking of property within the meaning of the Fifth Amendment. See *Pumpelly* v. *Green Bay Co.,* 13 Wall. 166, 181; *United States* v. *Cress,* 243 U. S. 316, 327–329; *United States* v. *Kansas City Ins. Co.,* 339 U. S. 799, 809–811. Nevertheless, it is argued that the Government cannot be required to pay compensation for the destruction of the easement in the present case because the easement was subject to the overriding navigational servitude of the United States.

This navigational servitude—sometimes referred to as a "dominant servitude," *Federal Power Comm'n* v. *Niagara Mohawk Power Corp.,* 347 U. S. 239, 249, or a "superior navigation easement," *United States* v. *Grand River Dam Authority,* 363 U. S. 229, 231—is the privilege to appropriate without compensation which attaches to the exercise of the "power of the government to control and

regulate navigable waters in the interest of commerce."
*United States* v. *Commodore Park,* 324 U. S. 386, 390.
The power "is a dominant one which can be asserted
to the exclusion of any competing or conflicting one."
*United States* v. *Twin City Power Co.,* 350 U. S. 222,
224–225; *United States* v. *Willow River Co.,* 324 U. S.
499, 510. A classic description of the scope of the power
and of the privilege attending its exercise is to be found
in the Court's opinion in *United States* v. *Chicago, M.,
St. P. & P. R. Co.:*

> "The dominant power of the federal Government,
> as has been repeatedly held, extends to the entire
> bed of a stream, which includes the lands below ordi-
> nary high-water mark. The exercise of the power
> within these limits is not an invasion of any private
> property right in such lands for which the United
> States must make compensation. [Citing cases.]
> The damage sustained results not from a taking of
> the riparian owner's property in the stream bed, but
> from the lawful exercise of a power to which that
> property has always been subject." 312 U. S. 592,
> 596–597.

Since the privilege or servitude only encompasses the
exercise of this federal power with respect to the stream
itself and the lands beneath and within its high-water
mark, the Government must compensate for any taking
of fast lands which results from the exercise of the power.
This was the rationale of *United States* v. *Kansas City
Ins. Co.,* 339 U. S. 799, where the Court held that when
a navigable stream was raised by the Government to its
ordinary high-water mark and maintained continuously
at that level in the interest of navigation, the Govern-
ment was liable "for the effects of that change [in the
water level] upon private property beyond the bed of
the stream." 339 U. S., at 800–801. See also *United
States* v. *Willow River Co.,* 324 U. S. 499, 509.

But though the Government's navigational privilege does not extend to lands beyond the high-water mark of the stream, the privilege does affect the measure of damages when such land is taken. In *United States* v. *Twin City Power Co.*, 350 U. S. 222, we held that the compensation awarded for the taking of fast lands should not include the value of the land as a site for hydroelectric power operations. It was pointed out that such value, derived from the location of the land, is attributable in the end to the flow of the stream—over which the Government has exclusive dominion. 350 U. S., at 225–227. Thus, just as the navigational privilege permits the Government to reduce the value of riparian lands by denying the riparian owner access to the stream without compensation for his loss, *United States* v. *Commodore Park*, 324 U. S. 386, 390–391; *Scranton* v. *Wheeler*, 179 U. S. 141, 162–165; *Gibson* v. *United States*, 166 U. S. 269, 276, it also permits the Government to disregard the value arising from this same fact of riparian location in compensating the owner when fast lands are appropriated.

The Government's argument is that the rationale of *Twin City* makes payment of any compensation for the destruction of the respondent's easement unnecessary in the present case. This argument is based on the theory that the respondent's easement had no value save in conjunction with water power development. The respondent acknowledges that the courts below were correct in excluding any value of the easement derived from the availability of the land for water power purposes. It argues, however, that the easement had other value, derived from uses of the land not dependent upon the flow of the stream. If the easement did have such value, then the Government must compensate for the easement's destruction under the rule of *Kansas City Ins. Co., supra,* since the easement was a property right in fast lands. The basic issue is thus whether the respondent's easement

might be found to have value other than in connection with the flow of the stream.

We think such a finding might be warranted. The evidence was that the highest and best use of the servient land (unconnected with riparian uses) was for agriculture, timber and grazing purposes. The respondent had an exclusive and perpetual property right to destroy those uses and the value which they created. This right was an attribute of a transferable, commercial easement with intrinsic value. It had been acquired for a valuable consideration. It had a marketability roughly commensurate with the marketability of the subservient fee. Only an adventurous purchaser would have acquired the underlying fee interest in the 1540-acre tract for any purpose whatever, without also purchasing the easement.

If easements to flood fast lands were worthless as a matter of law when taken by the United States, it would follow that when the Government took such an easement from the owner of an unencumbered tract of land, the Government would have to pay the owner nothing. That is not the law. *United States* v. *Kansas City Ins. Co.,* 339 U. S. 799. The Government itself acknowledges that it must pay such a landowner for the value of the property which does not stem from the flow of the stream, the value based upon the nonriparian uses of the property.

It follows that the Government must likewise compensate the easement owner for that aspect of the easement's value which is attributable not to water power, but to the depreciative impact of the easement upon the nonriparian uses of the property. The valuation of an easement upon the basis of its destructive impact upon other uses of the servient fee is a universally accepted method of determining its worth. See, *e. g., Olson* v. *United States,* 292 U. S. 246, 253; *Karlson* v. *United States,* 82 F. 2d 330, 337; Jahr, Eminent Domain, 252 and n. 6 (collecting cases); 4 Nichols, Eminent Domain, § 12.41 [2], n. 27

(collecting cases) (1951 ed.); 1 Orgel, Valuation under Eminent Domain, § 106, at 454 (2d ed.); Saxon, Appraising Flowage Easements, 24 Appraisal Journal 490, 494.

But the Government contends that the market value of the easement to those interested in developing the nonriparian uses of the fee can be ignored. It is claimed that, despite the general principle of indemnification underlying the Fifth Amendment, see *Olson* v. *United States*, 292 U. S. 246, 255, no compensation should be allowed for this value because it represents the "destructive function" of the easement. Cf. *Roberts* v. *New York*, 295 U. S. 264, 283. It is argued that equitable principles prohibit compensation for such value. But equity works the other way. At the very least, the Government's argument would mean, in a case like this one, that compensation could be denied the fee owner because he had already conveyed the flowage easement, cf. *United States* v. *Sponenbarger*, 308 U. S. 256, 265–266, and denied the owner of the easement because it was valueless against condemnation by the United States. The Government would thus destroy the entire property interest in fast lands without compensation. "The word 'just' in the Fifth Amendment evokes ideas of 'fairness' and 'equity' . . . ." *United State* v. *Commodities Corp.*, 339 U. S. 121, 124; see *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, 324–326. The result contended for by the Government would hardly comport with those standards. The District Court and the Court of Appeals were correct in holding that a flowage easement over fast lands adjoining a navigable stream is property which cannot be appropriated without compensating the owner.

The remaining question is whether the District Court's method of determining the amount of compensation to be awarded was correct. The court was clearly right in excluding all value attributable to the riparian location of the land. *United States* v. *Twin City Power Co.*,

350 U. S. 222. There can be no quarrel either with the court's procedure in directing the Commissioners to appraise first the easement taken by the Government, and then to apportion its value between the respondent and the owner of the subservient fee.[3] *United States* v. *Dunnington*, 146 U. S. 338, 343–345, 350–354. And the court adopted an acceptable method of appraisal, indeed the conventional method, in valuing what was acquired by the Government by taking the difference between the value of the property before and after the Government's easement was imposed. See *Olson* v. *United States*, 292 U. S. 246, 253.[4] For these reasons we think that the court followed an entirely acceptable procedure in valuing the totality of what was appropriated by the Government.

In apportioning the respondent's share of this value, however, we think that the court erred.[5] The court

[3] The owner of the fee, having agreed to convey her interest for one dollar, would, of course, not receive any larger amount apportioned to her interest. See *Albrecht* v. *United States*, 329 U. S. 599.

[4] In determining the value of the Government's easement, the court assumed its proportions to be limited to 1540 acres, rather than to the 1840 acres actually taken. This was entirely permissible. Since the owner of the fee was making no claim, the only objective of the proceedings in the District Court was to determine the amount of compensation to be awarded the respondent. It was quite logical, therefore, to appraise only that part of the Government's easement which coincided with the respondent's property interest, and thereafter to apportion to the respondent its share of what was taken by that much of the Government's appropriation.

[5] The court did not err, however, in including in the award to the respondent an amount for damages to the residue of the estate. The respondent was the record owner of the right to damage the residue, a right which the owner had expressly conveyed by separate deed for a valuable consideration. This was a property right in the residue, measurable by a monetary award to cover damages to the same. The amount of this portion of the award would depend upon the probability of the respondent's easement being exercised. See accompanying text, *infra*.

apparently was of the view that the subservient fee interest in the 1540 acres was without value, and accordingly awarded to the respondent the entire value of what the Government appropriated in that acreage. The respondent was thus compensated as though it were the owner, not of an easement, but of an unencumbered fee, as the Court of Appeals recognized. 270 F. 2d, at 712. The record does not support such an apportionment.

The guiding principle of just compensation is reimbursement to the owner for the property interest taken. "He is entitled to be put in as good a position pecuniarily as if his property had not been taken. He must be made whole but is not entitled to more." *Olson* v. *United States,* 292 U. S. 246, 255. In many cases this principle can readily be served by the ascertainment of fair market value—"what a willing buyer would pay in cash to a willing seller." *United States* v. *Miller,* 317 U. S. 369, 374. See *United States* v. *Commodities Corp.,* 339 U. S. 121, 123; *United States* v. *Cors,* 337 U. S. 325, 333. But this is not an absolute standard nor an exclusive method of valuation. See *United States* v. *Commodities Corp., supra,* at 123; *United States* v. *Cors, supra,* at 332; *United States* v. *Miller, supra,* at 374–375; *United States* v. *Toronto Nav. Co.,* 338 U. S. 396.

The record in the present case, as might be expected, contains no evidence of a market in flowage easements of the type here involved. In the absence of such evidence, the court valued the flowage easement as the equivalent of the value of the servient lands for agricultural, forestry, or grazing use. The court thus ascribed a maximum value to the respondent's easement, a value not supported by the record.

We think the correct approach to the problem of valuation in a case of this kind was formulated by the Court of Appeals for the Fifth Circuit in *Augusta Power*

*Co.* v. *United States,* 278 F. 2d 1. The basic issues in that case were virtually indistinguishable from those presented here.[6] We are content to adopt the language of Judge Rives' opinion with respect to the standard to be followed in valuing flowage easements of this character:

"If [the] Power Company had been successful in assembling the necessary lands, and in securing approval of the Federal Power Commission, and thereafter had actually exercised its easements by permanently flooding the lands, their value for agricultural and forestry purposes would have been destroyed. If, with that status, the United States had condemned the lands, the compensation due would be payable to [the] Power Company. That compensation would not include the hydroelectric power value, but it would embrace [the Power Company's] property right to destroy the value of the lands for agricultural and forestry purposes.

"At the other extreme, if factors such as difficulty of assemblage of all necessary lands, the increasing economic advantage of steam plants over hydroelectric plants, the need for additional power in the particular area, etc., had made it certain that the flowage easements would never be exercised by the . . . Power Company or its assigns, *excluding the United States,* then such compensation as might be due would be payable to the owners of the fee title and nothing to the . . . Power Company.

---

[6] In that case the Government had also argued upon the basis of our *Twin City* decision, that a private flowage easement over fast lands is valueless as a matter of law when taken by the Government for navigational purposes. The argument was unambiguously rejected: "Very clearly, the United States is in error when it claims . . . that it 'has a dominant servitude which it can exercise in its discretion and without compensation.' " 278 F. 2d, at 4.

"Between the two extremes just illustrated, the respective values of the fee and of the easement would fluctuate from time to time depending on the probability or improbability of actual exercise of the easement by the . . . Power Company or its assigns. If all interested parties were before the Court, the *maximum* which the United States would be required to pay would be the value of the lands, not including their value for hydroelectric power purposes. That is, however, a *maximum*, and not necessarily the measure of what the United States would have to pay under any and all circumstances. . . .

.    .    .    .    .

". . . It seems to us that the *maximum* compensation payable for the flowage easement under any conceivable circumstances is so much of the value of the lands for agricultural and forestry purposes and for any other uses, not including hydroelectric power value, as the easement owner has a right to destroy or depreciate. That *maximum* is more simply expressed in the criterion adopted by the Commission, i. e., 'the difference in the value of the land with and without the flowage easement.' Subject to that *maximum,* the actual *measure* of compensation payable for the flowage easement is the value of the easement to its owner. 'The question is, What has the owner lost? not, What has the taker gained?' 1 Orgel on Valuation Under Eminent Domain, p. 352." *Augusta Power Co.* v. *United States,* 278 F. 2d 1, 4–5. (Footnotes omitted.)

In a word, the value of the easement is the nonriparian value of the servient land discounted by the improbability of the easement's exercise. It is to be emphasized that in assessing this improbability, no weight should be given

to the prospect of governmental appropriation. The value of the easement must be neither enhanced nor diminished by the special need which the Government had for it. *United States* v. *Cors,* 337 U. S. 325, 332–334; *United States* v. *Miller,* 317 U. S. 369; *Olson* v. *United States,* 292 U. S. 246, 261; *United States* v. *Chandler-Dunbar Water Power Co.,* 229 U. S. 53, 76. The court must exclude any depreciation in value caused by the prospective taking once the Government "was committed" to the project. *United States* v. *Miller, supra,* at 376–377; see *United States* v. *Cors, supra,* at 332. Accordingly, the impact of that event upon the likelihood of actual exercise of the easement cannot be considered. As one writer has pointed out, "[i]t would be manifestly unjust to permit a public authority to depreciate property values by a threat . . . [of the construction of a government project] and then to take advantage of this depression in the price which it must pay for the property" when eventually condemned. 1 Orgel, Valuation under Eminent Domain, § 105, at 447 (2d ed.); see *Congressional School of Aeronautics* v. *State Roads Comm'n,* 218 Md. 236, 249–250, 146 A. 2d 558, 565.

The judgment is vacated, and the case remanded to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

Mr. Justice Douglas, concurring.

If the 1,840 acres in question lay between low and high water, the United States by keeping the water level at the ordinary high-water contour would not in my view appropriate any private property. For that is use of the bed of the stream pursuant to the navigation servitude. Most of our cases deal with that. It was in that domain

that *United States* v. *Kansas City Ins. Co.*, 339 U. S. 799, arose.

If the 1,840 acres were a dam site, any of their value for such a purpose would be noncompensable within the ruling of *United States* v. *Twin City Power Co.*, 350 U. S. 222. Dam-site value is water-power value. And the flow of the stream in its natural state or through a structure that is low or high provides "a head of water" (*United States* v. *Willow River Co.*, 324 U. S. 499, 502) that often has great value. But when it is in a navigable stream, it is not a property right subject to private ownership and compensation under the Fifth Amendment. There is "no private property in the flow" of this navigable stream. *United States* v. *Appalachian Power Co.*, 311 U. S. 377, 427.

Yet if the Federal Government builds a dam that raises the water above the ordinary high-water mark by a foot, by a hundred feet, or by five hundred feet, it asserts dominion over property not within its navigational servitude. As we said in *United States* v. *Willow River Co.*, *supra*, 509, "High-water mark bounds the bed of the river. Lands above it are fast lands and to flood them is a taking for which compensation must be paid."

It is in the latter domain that the present controversy lies. The flowage rights being condemned are rights to flood a part of the 1,840-acre tract that lies above the "usual water line" which I understand to mean land above the ordinary high-water mark.

Whatever may be the reason why this particular interest in the uplands was acquired, the owner stands in the shoes of his predecessor in title. The owner of the easement is entitled, as the Court holds, to no water-power value. The owner is, in other words, entitled to nothing that gains value from the flow of the stream, from any head of water, or from the strategic location of his land

for hydroelectric development of the river. But the owner of the easement and the owner of the subservient fee have all the other parts of the bundle of rights that represent "property" within the meaning of the Fifth Amendment.

Hence, I join the opinion of the Court.

MR. JUSTICE WHITTAKER, with whom THE CHIEF JUSTICE and MR. JUSTICE BLACK join, dissenting.

In the hope that it might eventually acquire from the Federal Government a license to construct a power dam across a navigable river, the power company acquired, by conveyances from the fee owners, easements permanently to flood 1,540 acres of fast lands adjacent to the river. It did not own any other estate or interest in those lands, and the exercise of its easement to flood them was, of course, necessarily subject to the prior issuance of a federal license authorizing the private damming of the river, for without such a license the power company could not dam the river, see § 4 of the Federal Power Act, 41 Stat. 1065, 16 U. S. C. § 797, and thus back its waters upon those lands, and it had no right to use the lands for any other purpose.

No federal license to dam the river at or near this point was ever issued. Instead, the Federal Government itself determined to construct a power dam at this point in the river, and as a necessary consequence to inundate these lands as a part of the resulting reservoir. To that end, it brought this condemnation action against the power company, and therein filed its declaration of taking, and took, the latter's easement to back flow these lands, and the question here is: What value, if any, did that easement have *to the power company at the time* the Government took it?

We think that, as a matter of fact and of law, it did not have any value whatever at that time. This is so because: (1) The sole and only right the power company ever had

in these lands was the right to dam and back the river's waters upon them; (2) the exercise of that right was always contingent and dependent upon the prior issuance of a federal license authorizing the private damming of the river (16 U. S. C. § 797(e)), for the Government's power over the flow of a navigable stream "is a dominant one which can be asserted to the exclusion of any competing or conflicting one," *United States* v. *Twin City Power Co.*, 350 U. S. 222, 224–225; and (3) when the Government determined to construct the power dam and appurtenant facilities for its own benefit, it necessarily "displace[d] all competing interests and appropriate[d] the entire flow of the river for the declared public purpose," *United States* v. *Twin City Power Co., supra,* at 225. (4) Therefore, at the time the Government took this easement, there was no possibility that the power company could ever dam and back the river's waters upon these lands and, inasmuch as it had no estate in or right to use the lands for any other purpose, it must follow that the easement was wholly without value to the power company for any purpose at the time the Government took it.

However, the Court, after adverting to the power company's argument that "the easement had other value, derived from uses of the land not dependent upon the flow of the stream," says: "We think such a finding might be warranted." It finds such value to exist in the "right to destroy [agricultural, timber and grazing] uses and the value which they created."

But the right to "destroy" agricultural uses, although a proper consideration in determining the damages to be paid to the owner of the unencumbered fee when an easement to flow is being condemned and taken from him, *United States* v. *Kansas City Ins. Co.*, 339 U. S. 799; *Olson* v. *United States,* 292 U. S. 246, 253–254, is not a thing of value—even of recognizable "hold up" value—to the owner of the easement, *United States* v. *Chandler-*

*Dunbar Co.,* 229 U. S. 53, 79–80, except for the author-ized flooding use, or possibly as against the owner of the subservient fee who might be willing to pay for the riddance of the easement and restoration of his original right to make agricultural uses of the land. See *Roberts* v. *New York City,* 295 U. S. 264, 282–283. At all events, the clincher is that any right of the power company to "destroy" agricultural uses of these lands consisted solely of its right to dam and back the river's waters upon them, and when the Government determined to construct the dam for its own benefit even that nebulous "right" was gone. Hence, the easement had no possible value—not even a nuisance value—to the power company at the time the Government took it.

It is settled that the "just compensation" required by the Fifth Amendment to be paid for the taking of private property for public use is the value at the very time of the taking to the person from whom taken. "The value should be fixed as of the date of the proceedings and with reference to the loss the owner sustains, considering the property in its condition and situation at the time it is taken and not as enhanced by the purpose for which it was taken. *Kerr* v. *Park Commissioners,* 117 U. S. 379, 387; *Shoemaker* v. *United States,* 147 U. S. 282, 304, 305." *United States* v. *Chandler-Dunbar Co., supra,* at 76.

The Fifth Amendment "merely requires that an owner of property taken should be paid for what is taken from him. . . . And the question is what has the owner lost, not what has the taker gained." *Boston Chamber of Commerce* v. *Boston,* 217 U. S. 189, 195. See also *United States* v. *Twin City Power Co., supra,* at 228. At the time of this taking, the Government had determined to build the dam itself, thus precluding any possibility that the power company could ever dam and back the river's waters upon these lands, and, inasmuch as it had no right

to use them for any other purpose, it must follow that the easement had no possible value to the power company at the time the Government took it. Surely "the Government cannot be justly required to pay for an element of value which did not [then] inhere in [the easement]." *United States* v. *Chandler-Dunbar Co., supra,* at 76.

Nor does the Fifth Amendment contemplate a disregard of separate estates and interests in land. It contemplates only that the condemnee shall be paid "just compensation" for the particular estate or interest that he owned and that was taken from him. In *Boston Chamber of Commerce* v. *Boston, supra,* the city condemned for public street purposes a part of a tract of land owned in fee by the Chamber of Commerce, but over a large portion of the part condemned a wharf company owned "an easement of way, light and air." The Chamber of Commerce and the wharf company agreed between themselves to claim, and they sought, damages to both estates "in a lump sum." If this could be done, it was agreed that the estate, considered as the sole unencumbered estate of a single person, was worth 12 times more than if the damage should be assessed according to the condition of the title at the time. The city's contention that the several estates should be separately valued was sustained by the trial court, and this Court, speaking through Mr. Justice Holmes, affirmed, saying:

"But the Constitution does not require a disregard of the mode of ownership—of the state of the title. It does not require a parcel of land to be valued as an unencumbered whole when it is not held as an unencumbered whole. It merely requires that an owner of property taken should be paid for what is taken from him. . . . And the question is what has the owner lost, not what has the taker gained." 217 U. S., at 195.

The Government cannot here, just as the city could not there, "be made to pay for a loss of theoretical creation, suffered by no one in fact," *id.*, at 194, for there is "no justice in [requiring the Government to pay] for a loss suffered by no one in fact." *United States* v. *Chandler-Dunbar Co., supra,* at 76.

Here the power company rests solely upon a claimed right to back the river's waters upon these lands. It thus necessarily depends upon and claims a right in and to use the waters of the river for that purpose. This Court held in the *Twin City* case, *supra,* that the owner of adjoining fast lands has no interest in the waters of a navigable river, and that those waters do not, as against the Government, attribute to the value of such lands. It said:

> "If the owner of the fast lands can demand water-power value as part of his compensation, he gets the value of a right that the Government in the exercise of its dominant servitude can grant or withhold as it chooses. The right has value or is an empty one dependent solely on the Government. What the Government can grant or withhold and exploit for its own benefit has a value that is peculiar to it and that no other user enjoys." 350 U. S., at 228.

The Government, by determining to exploit its stream for its own benefit, "displace[d] all competing interests and appropriate[d] the entire flow of the river for the declared public purpose." *Id.,* at 225. In these circumstances, "[t]o require the United States to pay for this water-power value would be to create private claims in the public domain." *Id.,* at 228.

The *Twin City* and *Chandler-Dunbar* cases, *supra,* seem clearly to require the conclusion, on the facts here, that the easement to flood these lands had no value to the power company at the time the Government took it.

It was its failure to obtain a federal license to dam the river—not the taking of its easement to flow—that hurt the power company, for once the Government determined to construct the power dam for its own use and benefit no possibility remained that the power company could ever use the easement, and hence its entire value was gone.

To the Court's observation that "the Government's argument would mean, in a case like this one, that compensation could be denied the fee owner because he had already conveyed the flowage easement, . . . and denied the owner of the easement because it was valueless against condemnation by the United States," the law requires us to say: Exactly so. The fee owners had sold and conveyed, for consideration satisfactory to them, the right permanently to flood these lands and no longer owned any interest in *that estate*. Indeed, they claim none. That estate in these lands was not taken by the Government from them. Not having taken anything from the fee owners, the Government does not owe them "just compensation" for anything. This also demonstrates the Court's further error in remanding the case for "apportionment" of the "damages" between the owner of the easement and the owners of the fee. In no event could there be anything to apportion to the fee owners. What the Government took was the easement. It belonged solely to the power company, and if it had any value at the time it was taken by the Government, that value belonged solely to the power company. But the easement had no value to the power company at the time it was taken by the Government. The power company's sole estate in these lands was an easement to back the river's waters upon them. The exercise—and hence the value— of that easement was always contingent upon the prior issuance of a federal license authorizing the private dam-

ming of the river. No such license was ever issued. Instead, the Government determined to construct the dam and appurtenant facilities for its own benefit. This left no possibility that the power company could ever dam and back the river's waters upon these lands, and inasmuch as it had no right to use them for any other purpose, it seems clearly to follow that the easement was wholly without value to the power company for any purpose at the time the Government took it.

It is of course true, as already stated, that if the Government had taken the right to flow these lands from the owner of the unencumbered fee, the law would require it to pay his damages resulting from that deprivation of his right to make agricultural and similar surface uses of these lands. *United States* v. *Kansas City Ins. Co., supra.* From that premise it is argued that the owner of the easement to flow, having acquired it from the owner of the unencumbered fee, "stands in the shoes of his predecessor in title" and is thus entitled to like damages from the Government when it takes that easement from him. But that premise is erroneous. The error lies in the obvious fact that the power company never acquired or owned any right to make agricultural uses of these lands. Hence it did not suffer, and is not entitled to recover, any damages for the destruction of such uses. Quite distinguishable from an unencumbered fee, the only estate of the power company in these lands was the right to store the river's waters upon them. Once the Government determined to construct the power dam for its own use no possibility remained that the power company could ever use the lands for that purpose and, having no right to use the lands for any other purpose, it must follow that the easement was wholly without value to the power company for any purpose at the time the Government took it.

We believe that the Fifth Amendment's command that "private property [shall not] be taken for public use, without just compensation" should be liberally construed in favor of the condemnee, but that does not mean that the Government should be required to pay something for nothing.

For these reasons, we think the judgment should be reversed with directions to enter judgment for the Government.