**Alva A. AARON et al.**

**v.**

**The UNITED STATES.**

**Trine S. ALNE and Ernest A. Alne**

**v.**

**The UNITED STATES.**

**Nos. 489–58, 42–60.**

United States Court of Claims.

Oct. 16, 1964.

---

2. There do not appear to have been any live witnesses other than plaintiff.

Irl Davis Brett, Pasadena, Cal., for plaintiffs.

Herbert Pittle, Washington, D. C., with whom was Asst. Atty. Gen. Ramsey Clark, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE and DAVIS, Judges.

PER CURIAM.

This case was referred pursuant to Rule 57(a) to Lloyd Fletcher, a trial commissioner of this court, with directions to make findings of fact and recommendations for conclusions of law. The commissioner has done so in an opinion filed July 14, 1964. On August 3, 1964, the plaintiffs filed a motion to adopt the commissioner's report and on August 24, 1964, the defendant filed an election to adopt the commissioner's report. Since the court is in agreement with the findings and recommendations of the trial commissioner in the opinion, as hereinafter set forth, without oral argument it hereby adopts the same as the basis for its judgment in these cases. As to case No. 489–58, the nine plaintiffs named in findings 1 and 12 are entitled to recover, and judgment is entered for them in the amounts listed opposite their respective names under the column headed "Damages" in finding 12, plus an amount computed at a rate of four (4) percent per annum from August 1, 1953, to date of payment, all as part of just compensation for the taking of a flight easement. As a condition of this judgment, defendant is vested with a permanent easement of flight for aircraft of any character, at altitudes of 400 feet and above, over the properties described in the court's decision of January 11, 1963, as parcels 9, 10, 11, 12, 15, 24, 26, 27, and 33. Other than Clayton E. Smith and Delia A. Smith, who are no longer owners of parcel 33, plaintiffs will execute and deliver to defendant deeds describing and conveying the interest so taken.

The plaintiffs in No. 42–60 are not entitled to recover and their petition is dismissed.

OPINION OF COMMISSIONER

On January 11, 1963, the court handed down its opinion in the cases of Aaron et

al. v. United States, No. 489–58 and Andersen et al. v. United States, No. 113–59, Ct.Cl., 311 F.2d 798. In the Andersen case, the court held that none of the plaintiffs were entitled to recover, and the petition in that case was dismissed. However, in the Aaron case, the court held that nine of the plaintiffs (and their respective spouses) were entitled to recover but dismissed the petition as to the remaining plaintiffs.[1] Those nine plaintiffs, and the parcel numbers assigned to their properties, are as follows:

| Name | Parcel No. |
| --- | --- |
| Jack W. Clippinger, et ux | 9 |
| Joseph B. Coburn, et ux | 10 |
| Sidney S. Cogburn, et ux | 11 |
| Clifford E. Dahl, et ux | 12 |
| Ralph L. Fogg, et ux | 15 |
| Albert L. McGuire, et ux | 24 |
| Raymond W. Morrett, et ux | 26 |
| John F. Morris, Jr., et ux | 27 |
| Clayton E. Smith, et ux | 33 |

The court directed that the Aaron case be remanded to the trial commissioner to take proof on the amount of just compensation to which the above-mentioned plaintiffs are entitled, such amount of just compensation to be "determined in accordance with this opinion."

Meanwhile, action had been withheld in the case of Alne et al. v. United States, No. 42–60, which involved parcels of unimproved land located in the same geographic area as the nine parcels in the Aaron case listed above.

By stipulation of the parties, approved by the commissioner, it was agreed that pertinent parts of the court's findings of fact relating to the nine parcels of land above-listed in the Aaron case should apply equally to the parcels in the Alne case. As a result, the Aaron and Alne cases were consolidated for trial in Los Angeles, California, as to the amount of just compensation to which the nine

plaintiffs in the Aaron case shall be entitled and as to the issue of liability and the amount of just compensation, if any, to which the plaintiffs in the Alne case may be entitled.

### The Aaron Parcels

As previously observed, in the Aaron case there remains for determination only the question of the amounts due from defendant to the nine remaining plaintiffs as fair compensation for the taking of a permanent avigation easement over their properties. In this connection, at page 802 of the opinion handed down January 11, 1963, the court instructed the trial commissioner as follows:

"This leaves the question of the measure of damages. In a case of this sort that measure is the difference in the value of plaintiffs' properties *before the taking by the United States in August 1953 and their value after the full extent of the impairment of plaintiffs' use and enjoyment of them became apparent. United States v. Dickinson, supra. This was some time between August 1953 and October 1956, when the use of this runway was largely discontinued* in favor of the east-west runway.

"While since October 1956 this runway was used only occasionally, it seems apparent that defendant intends to use it at will for an indefinite period. We, therefore, agree with the Trial Commissioner that the defendant has taken a permanent easement of flight over the property of the named plaintiffs at altitudes of 400 feet and above" [Emphasis supplied.]

A. *The Date of Taking.* From the above-quoted excerpt, as well as from earlier statements in the court's opinion,[2] it is entirely clear to me that the

---

1. The Aaron case originally involved 38 different parcels of land, and the Andersen case involved 15 different parcels.

2. For example, the following statements appear on page 800 of Judge Whitaker's opinion in 311 F.2d:

"* * * So long as these flights did not seriously interfere with the use and

court has directly held the date of taking in this case to be in August 1953. However, counsel for plaintiffs strenuously disputes that this is true. He argues that Judge Whitaker's reference to the "taking by the United States in August 1953" must be deemed "an inadvertence" when viewed in the light of the supporting citation of United States v. Dickinson, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947). In brief, the argument is that since Dickinson established the date of taking in a gradual acquisition (water flowage) to be the date when the final consequences thereof were manifest (complete flooding), and since Judge Whitaker has stated in this case that the full extent of the impairment of plaintiffs' properties became apparent (citing Dickinson, supra) "some time between August 1953 and October 1956, when the use of this runway was largely discontinued," it must logically follow that he was in reality saying that the date of taking was October 1956. Otherwise, say plaintiffs, the citation of Dickinson was meaningless.[3]

But, in my opinion, this argument fails to grasp the real meaning of Judge Whitaker's language. He said that the full impairment to the properties occurred *some time between* August 1953 and October 1956, and his reference to the latter date merely pinpointed an outside date of impairment, a date when defendant had shifted the bulk of its flight activities to another runway. In my view, he intended to and did leave for future decision any determination of the date of final impairment following the presentation of valuation testimony. For reasons now to be explained, I believe that the combined effect of the evidence both before Commissioner White and me shows that the full effect of the avigation easement had become apparent by at least the end of 1953 and probably before that date.

We might well ask (admittedly with the benefit of hindsight) what a prospective and well-informed buyer would have known by that time. Although defendant's representatives then would have denied that their flights were low enough to constitute a taking, they would undoubtedly have admitted that, by August 1953, Air Force pilots were regularly and frequently flying jet aircraft over these properties with the full intention of continuing to do so at will. (Finding 31.) He would have learned that the properties were zoned so that they could be used only for residential and agricultural purposes (finding 7), which zoning accordingly fixed their highest and best use. By at least the end of 1953, the residents in the area could have told our hypothetical buyer that defendant's fre-

---

enjoyment of their properties, the defendant did not impose a servitude upon them for which plaintiffs are entitled to compensation. *In our opinion this did not occur until August 1953* for the reasons now to be stated. [Emphasis supplied.]

\*   \*   \*   \*   \*

" \*   \*   \*   *The Trial Commissioner fixed August 1953 as the date of the taking*, because at that time Air Force pilots began making test flights. We do not think this is determinative, but *the record does not show substantial interference before that date, but it does show it thereafter. Hence, we see no reason to depart from the date fixed by the Trial Commissioner. Plaintiffs' counsel in oral argument accepted that date as the one on which the statute of limitations began to run.*" [Emphasis supplied.]

3. The importance of this argument to plaintiffs stems from the fact that, between August 1953 and October 1956, substantial improvements were made to five of the Aaron parcels. Thus, if the date of taking is October 1956, those parcels start with a significantly higher "before-taking" valuation than would be the case of such valuation in August 1953 with a consequent increase in the amount of damages. With respect to the Alne parcels, the establishment of an October 1956 date of taking is even more critical. Since the Alne plaintiffs acquired their properties *after August 1953*, they cannot recover at all if that is the date of taking. Assignment of Claims Act of 1940, 54 Stat. 1029, 31 U.S.C. § 203; Potts v. United States, 126 F.Supp. 170, 130 Ct.Cl. 88, 93 (1955).

quent low flights over their properties had directly and substantially interfered with their use and enjoyment thereof by shaking their buildings, interfering with radio and television reception, making it impossible to use the telephone or to conduct conversations, and, in some instances, adversely affecting their operation of chicken farms. (Finding 31.) Viewing the composite mass of his information, it is reasonable to conclude that our well-informed buyer would have recognized the existence of a permanent avigation easement over the properties and that, accordingly, his opinion of their value would have dropped to its perigee.

It is true that from this time until October 1956, there was a slow but steady increase in the number of flights over the properties (finding 22), which fact suggests some logic in plaintiffs' contention that the Dickinson doctrine of creeping acquisition is applicable. However, such an interpretation of the Dickinson decision implies that the Supreme Court there determined the date of taking on the basis of some arithmetical computation as to the number of gallons of water accumulating on the flooded property. I do not believe the Court intended any such "Univac" approach. It was concerned instead with whether "the consequences of inundation have so manifested themselves that a final account may be struck." 331 U.S. 749, 67 S.Ct. 1385. Here, despite the increasing number of defendant's overflights through October 1956, the record seems clear enough that, during the latter part of 1953, the basic consequences to the underlying properties had become manifest.

■ The search for that elusive phantom, a comparison of fair market values, is difficult at best. Absent more compel-

ling reasons than are present here, that search ought not to be further convoluted by a consideration of a host of cross influences, unrelated to the avigation easement, which over a period of time inevitably will affect property values.[4] Any effort to unscramble the ingredients in such an omelet would almost necessarily result in unfairness to one of the parties. Hence, when the record will permit, as here, the evaluator of damage should select an "after" valuation date as close as possible to the date of taking.

■■ Although they disagree as to the applicable date, counsel for both parties take the position in their briefs that interests in properties taken by the United States should be valued *immediately* before and *immediately* after the taking, that is to say, as of the date of taking. There is no doubt that this is a general and frequently applied rule in eminent domain cases. See, for example, United States v. Virginia Electric & Power Co., 365 U.S. 624, 632, 640, 81 S.Ct. 784, 5 L.Ed.2d 838 (1961); United States v. Miller, 317 U.S. 369, 374, 63 S.Ct. 276, 87 L.Ed. 336 (1943); Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236 (1934); and Potts v. United States, 126 F. Supp. 170, 130 Ct.Cl. 88 (1955). But, just as the traditional valuation rule of what-a-willing-buyer-would-pay-in-cash-to-a-willing-seller is "not an absolute standard nor an exclusive method of valuation" (United States v. Virginia Electric & Power Co., supra, 365 U.S. at p. 633, 81 S.Ct. at p. 791), so can there be instances where it is proper to disregard the usual immediately-before-and-immediately-after rule. See, for example, Jensen v. United States, 305 F.2d 444, 158 Ct.Cl. 333. There the diminution in fair market value of the subservient lands was found

4. As will be shown below, the real estate appraisers who testified herein were able to arrive at valuations of the properties as of August 1953 and as of October 1956 using familiar and accepted techniques of appraisal. What they could not say, however, was that the difference between the two values was solely attributable to the impact of the avigation ease-

ment. This was because too many extraneous factors affecting the property values had intervened during the three-year period. Yet, it goes without saying that, in this type of case, the United States is liable only for the damage which its taking has caused to the property. United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946).

to be the difference between their value on the date of taking and their value as of approximately one year thereafter. See the court's finding 41.

■ In the present case, also, the court has clearly indicated its opinion that some period of time elapsed after the date of taking before the full impact of the easement on plaintiffs' properties was apparent. For the reasons already discussed, I have concluded that the full impact date had arrived in the circumstances of this case by at least the end of 1953.

B. *Damages to the Aaron Parcels.* From the record in its entirety, I have found that the following table correctly reflects the damages suffered by each of the Aaron parcels as a result of the avigation easement imposed thereon by defendant in August 1953:

| Name of owner | Before value | After value | Damages |
|---|---|---|---|
| Clippinger | $13,000 | $ 6,500 | $ 6,500 |
| Coburn | 13,500 | 6,750 | 6,750 |
| Cogburn | 18,800 | 9,400 | 9,400 |
| Dahl | 23,500 | 11,750 | 11,750 |
| Fogg | 13,250 | 6,625 | 6,625 |
| McGuire | 17,700 | 8,850 | 8,850 |
| Morrett | 17,900 | 8,950 | 8,950 |
| Morris | 22,700 | 11,350 | 11,350 |
| Smith | 83,500 | 41,750 | 41,750 |

■ A glance at the foregoing table is sufficient, of course, to show that it represents an average decline in value of one-half the pre-existing values. While, obviously, one can have no deep-seated conviction as to the complete accuracy of such a valuation determination, it does not reflect a mere fatigue decision. For reasons now to be discussed, the nature of the available evidence relating to the amount of damage to these properties is such as to preclude any truly satisfactory determination other than by a broad inference in the nature of a jury verdict. This is nothing new in the Court of Claims. See Western Contracting Corporation v. United States, 144 Ct.Cl. 318, 320 (particularly finding 39); Needles for Use and Benefit of Needles v. United States, 101 Ct.Cl. 535, 618 (1944); Chalender v. United States, 119 F.Supp. 186, 127 Ct.Cl. 557, 566 (1954); Davis v. United States, 287 F.2d 168, 152 Ct.Cl. 805, decided February 14, 1964, and Cors v. United States, 96 F. Supp. 460, 119 Ct.Cl. 296, 306 (1951) (dissenting opinion). As the Supreme Court observed in United States v. Smith, 94 U.S. 214 at page 219, 24 L.Ed. 115 (1876):

"In the estimation of damages the Court of Claims occupies the position of a jury under like circumstances. Damages must be proved. The court is not permitted to guess any more than a jury, but, like a jury, it must make its estimates from the proofs submitted. The result of the best judgment of the triers is all that the parties have any right to expect."

At the valuation trial in this case, each party presented opinion evidence by one expert real estate appraiser. As usual, the experts took highly polarized positions ranging from unbridled optimism to dejected melancholy.[5]

5. "The pattern has become all too familiar in the valuation cases, where opinion evidence is sometimes the only evidence available. The claimant seeks to estab-

Such extremes have come to be expected and no doubt arise from the almost incredible complexities inherent in the task of valuation. As the court said in Andrews v. Commissioner, 135 F.2d 314 at p. 317 (C.A. 2, 1943):

> * * * " 'Value' is not a single purpose word. Men have all but driven themselves mad in an effort to definitize its meaning. The problem arises in its most perplexing form when, as here, property has not in fact been sold and an effort is made to ascertain what it would have fetched if it had been sold. The answer is obviously a guess."

Both plaintiffs' witness, John A. Mawhinney, and the defendant's witness, Robert A. Rowe, were experienced and competent real estate appraisers. Each expressed an opinion as to the fair market value of the properties before the easement was imposed in August 1953, and, with the exception of one property, their "before" estimates were surprisingly close. Their wide divergences of opinion occurred in their estimates of the "after" values reflecting the damages flowing from the easement. See the comparative table contained in finding 7, infra.[6]

From hearing the testimony of the two experts, and from a detailed study of the record, I have concluded that Mawhinney's estimates of the "before" values as of August 1953 are reasonable and should be accepted. His testimony reflected considerable knowledge of local conditions and demonstrated meticulous and painstaking preparation. His analysis and use of comparable sales data for the "before" period were likewise impressive, and, as previously noted, even the Rowe "before" estimates were reasonably close in most instances.

I find it impossible, however, to accept the testimony of either appraiser as to the "after" values of these properties. Admittedly, they were quite handicapped by the nearly complete absence of any sales activity within the approach zone, wherein all these properties lie, from August 1953 through October 1956. Unquestionably, the market in the area was in a confused state.

Faced with this lack of market information, Mawhinney appears to have placed great reliance for his "after" values on a sale in 1963 of one of the properties here involved owned by Clayton E. Smith, et ux. That sale, ten years after the taking of the easement, was for a price approximately 75 percent below his estimate of the property's "before" value. This sale appears to have been the major factor in Mawhinney's ascertainment of "after" values because he arrived at them simply by reducing his "before" values approximately 75 percent on all the properties. While there appears no valid objection to treating all the affected properties alike, and while the Smith sale is indicative of a sharp decline in property values in the area, in my judgment, Mawhinney has overemphasized the effect to be given this sale so many years removed from the date of taking. Within such a span of

---

lish a benchmark in the stratosphere. Defendant burrows down to bedrock (which is usually about as far as it can go). The trier of the facts is, of course, in a quandary. Even by the simplest route (which the parties seem always to assume he will take), the median between the two extremes is somewhere in the upper atmosphere." Opinion of Commissioner Evans in Western Contracting Corporation v. United States, supra, 144 Ct.Cl. at page 334.

6. It will be noted from this table that the appraisers used varying dates. Mawhinney valued the properties on a "before" and "after" basis as of August 1953 and as of October 1956. The differences in his sets of figures for the two dates were caused solely by the addition of the value of improvements placed on the properties during the three-year interval. Rowe, on the other hand, used a "before" date of August 1953 and an "after" date of October 1956 and made estimates accordingly. However, in his requested findings of fact, counsel for defendant has taken the position that the "after" values testified to by defendant's appraiser as of October 1956 may also be considered as his opinion of the "after" values as of August 1953.

years, many other factors will affect the market.[7]

Rowe, on the other hand, weakened his appraisal by apparently continuing to believe, as he had in the first trial, that the defendant had not really taken an avigation easement susceptible to valuation. For example, although he believed several properties had declined in value, he found *no* change whatever in the value of two properties, and only a $500 diminution in value of another property, the latter three properties together comprising those which Commissioner White found to be the *most* affected by the overflights. One of those most affected properties was the Morrett parcel which Rowe appraised at $20,000 "before" value in August 1953 and at exactly the same "after" value in October 1956. He did precisely the same thing in his testimony at the earlier trial before Commissioner White who commented at page 18 of his opinion, as follows:

> "An appraiser testifying on behalf of the defendant expressed the opinion that as of July 1, 1953, the fair market value of parcel 27 [Morrett] was $20,000, and that this parcel continued to have the same value thereafter. However, this appraiser erroneously assumed that no flights of jet aircraft were made over parcel 27 at any time below the 500-foot level."

Mr. Rowe was not able satisfactorily to explain this anomaly, other than to attribute it to a combination of market forces occurring over the three-year period. No doubt, as he testified, a before and after valuation with a three-year interval posed a "difficult situation from an appraiser point of view." However, the fact that his value opinions on this property were identical at both trials leads almost irresistibly to the conclusion that his judgment continued to be affected by his deep-felt conviction that, in the "value" sense, the easement had really done nothing to the property.[8] Because of this, I have felt it necessary to discount some portions of the Rowe testimony.

As previously indicated, the record is convincing that the true damages to the Aaron parcels lie somewhere between the extremes stated by the opposing experts. See Bosland, Tax Valuation by Compromise, 19 Tax L.Rev. 77, 78 (Nov. 1963). From a careful study of all the testimony, it is recommended that the court enter judgments for the Aaron plaintiffs in the respective sums enumerated in the last column of the damage table set forth above. To those respective sums there should be added an amount computed at the rate of four (4) percent per annum from August 1, 1953 to date of payment, all as part of just compensation for the taking. Finally, it is recommended that, as a condition of its judgments, the court hold that defendant is vested with a permanent easement of flight by aircraft of any character over each of the Aaron parcels at elevations of 400 feet and above.

7. For example, the record shows intermittent depressions in the chicken and egg markets. The Smith property was operated as a poultry farm.

8. This difficulty with the meaning of "value" is not unusual. "In eminent domain, as in rate making, in corporate reorganization, in taxation, and in nearly every other legal field, the most vital disputes as to how much a given property is 'worth' are due, not to any mere quantitative differences of opinion such as would arise if two persons were trying to guess the weight of a book by looking at it, but rather to a fundamental disagreement as to the very *meaning* of the 'value' the amount of which is to be ascertained by the procedure of a trial. To revert to our analogy of weight-guessing, disputes as to value are analogous to those that would arise about the weight of a book if guesser A took 'weight' to mean the poundage that would be registered on a well-tested scale; if guesser B took it to mean poundage on the particular scale, however inaccurate, that happens to be at hand; if guesser C took it to mean how heavy the book looks; and if guesser D took it to mean the weightiness of the contents of the book as a contribution to science. This simile is not overdrawn." Orgel, Valuation under the Law of Eminent Domain, p. v. (1936).

### The Alne Parcels

 In my opinion, the Alne plaintiffs are not entitled to recover. It has been stipulated that they acquired title to the three parcels described in their petition on August 28, 1956. This, of course, was long after the taking by defendant which occurred, for reasons previously explained, in August 1953. Accordingly, these plaintiffs are not entitiled to recover by reason of the anti-assignment statute.[9] 54 Stat. 1029, 31 U.S.C. § 203. See, also, Potts v. United States, 126 F.Supp. 170, 130 Ct.Cl. 88, 93 (1955).

9. Even without the bar of the anti-assignment statute, the Alnes would not be entitled to recover for the reason that they were unable to show any further damage to the properties following their acquisition thereof. Their own appraiser testified that he knew of no factors that would have affected the value of the properties after the Alnes had acquired them which did not already exist before that time.