UNITED STATES of America, Plaintiff,

v.

CERTAIN LANDS IN TRURO, BARNSTABLE COUNTY, COMMONWEALTH OF MASSACHUSETTS, Defendants.

Civ. A. Nos. 68–208–C, 72–1423–C, 72–1792–MA, 73–780–C, 73–1051–C, 73–1278–F, 73–1671–T, 73–1837–MA, 74–182–C, 74–196–C, 74–113–G, 74–373–G, 74–1143–C, 74–1760–S, 74–1833–G and 74–4664–MA.

United States District Court,
D. Massachusetts.

Sept. 27, 1979.

Robert A. Mulligan, Asst. U. S. Atty., Boston, Mass., for plaintiff.

John D. Hallisey, Orleans, Mass., Loring P. Jordan, Jr., James M. Hughes, Boston, Mass., for defendants.

## OPINION

CAFFREY, Chief Judge.

On August 7, 1961 in order to preserve the unique scenic, scientific and historic features of the outer portion of Cape Cod, Congress created the Cape Cod National Seashore (hereinafter the Seashore) 16 U.S. C.A. §§ 459b–459b–8, 1961 U.S.Code Cong. & Admin.News, pp. 2214–2240. Recognizing the traditional Cape Cod way of life to be an essential element of the region's charm, Congress sought to enact a statutory scheme which would strike a balance between its desire to protect the wildness and natural beauty of the area from further development without sacrificing the human element already present there.

Had a town on Cape Cod sought to strike such a balance its solution would have been clear, the town could simply fashion a zoning provision which would protect the natural beauty within its boundaries without threatening the residential development already present there. However, because the power to enact zoning laws is vested in states and municipalities and not in the federal government, the option of changing local zoning laws was not available to the Congress of the United States.

Sections 459b–3 and 459b–4 were enacted by Congress in an effort to strike just such a balance between the natural beauty and human element of Cape Cod while coping with its inability to enact zoning laws. Under the terms of those two provisions persons owning homes within the Seashore are allowed to retain their dwellings for noncommercial residential purposes so long as there is some assurance that the land will not be put to any use which is inconsistent with the purposes of the Seashore.

Section 459b–3(b)(2) provides that improved property[1] located within the Sea-

---

1. Section 459b–3(d) defines improved property as "a detached one-family dwelling the con-struction of which was begun before September 1, 1959 (hereinafter referred to as 'dwell-

shore is not subject to condemnation if the town in which the property is located enacts a valid zoning bylaw approved by the Secretary of the Interior (hereinafter the Secretary). Once such a bylaw is approved, the Secretary becomes powerless to condemn improved property within that town's portion of the Seashore as long as that improved property is put to a use consistent with the bylaw.

If improved property in a town enacting a zoning bylaw approved by the Secretary is used or occupied in a manner inconsistent with that bylaw, or is made an exception to or the subject of a variance under the bylaw in a manner which is inconsistent with the regulations set forth by the Secretary,[2] or if the town in which the improved property is located does not enact a zoning bylaw which is approved by the Secretary, that improved property is subject to condemnation, 16 U.S.C.A. §§ 459b–1(a), 459b–4(d)(1), 459b–4(d)(2) with certain delineated limitations and exceptions 16 U.S.C.A. § 459b–3. In those situations as outlined above where the Secretary does have the power to condemn improved property, the Secretary must exercise that power in a manner which is consistent with the following rights to use and occupancy.

The owners of a freehold estate in improved property may elect to use and occupy their condemned homes for a term of twenty-five years 16 U.S.C.A. § 459b–3(a)(1)[3]. In the alternative those owning improved property in fee simple as of September 1, 1959 may elect to use and occupy

that land for life 16 U.S.C.A. § 459b–3(a)(2). Those holding a life estate or an estate for the life of another in improved property as of September 1, 1959 may elect to use and occupy the condemned property for the term of their estate. Additionally holders of a term of years on such property may elect to use and occupy the premises for twenty-five years or the remainder of their term whichever is the lesser 16 U.S.C.A. § 459b–3(a)(4).

These rights to use and occupancy are limited to noncommercial residential purposes and may be terminated if the Secretary discovers a use which is inconsistent with the purposes of the Seashore 16 U.S.C.A. § 459b–3(a)(8).

Clearly therefore although Congress recognized the value of retaining a human element within the Seashore, it was not willing to do so at the expense of the unique scenic, scientific and historic features of the region which the act sought to preserve. It did not guarantee that homes within the Seashore would escape condemnation proceedings if the town in which the improved property was located refused to enact a zoning bylaw which met with the approval of the Secretary of the Interior.

By enacting §§ 459b–3 and 459b–4 therefore, Congress motivated, and, as a practical matter, pressured the six affected towns to enact the zoning provisions which Congress itself was powerless to enact and at the same time reserved to the federal

ing'), together with so much of the land on which the dwelling is situated, the said land being in the same ownership as the dwelling, as the Secretary shall designate to be reasonably necessary for the enjoyment of the dwelling for the sole purpose of noncommercial residential use, together with any structures accessory to the dwelling which are situated on the land so designated. The amount of land so designated shall in every case be at least three acres in area, or all of such lesser amount as may be held in the same ownership as the dwelling and in making such designation the Secretary shall take into account the manner of noncommercial residential use in which the dwelling and land have customarily been enjoyed . . . ."

2. The Secretary was directed by Congress to submit proposed regulations to Congress and the affected towns specifying standards for the approval of zoning bylaws. Final regulations were to be promulgated by the Secretary after considering any modifications and amendments suggested by Congress or the towns in the ninety day period following their submission, 16 U.S.C.A. § 459b–4(a).

3. In the case of persons holding improved property for life or lives or for the life of another or others the statute requires the concurrence of the remaindermen before this right of election may be exercised.

government, in the person of the Secretary, the power to approve or disapprove each provision. As a result although it could not draft the zoning provisions itself, Congress made virtually certain that the provisions enacted by the towns would be consistent with the congressional objective of preserving the traditional Cape Cod way of life without risk of further development or of uses inconsistent with the purposes of the Seashore.

In April and May of 1962 Elmer Buschman, an attorney for the Department of Interior provided officials of the affected towns and members of the Cape Cod National Seashore Advisory Commission (hereinafter the Commission) with copies of suggested minimum zoning requirements. Although those documents were no longer available for production as evidence at the hearing held in this Court, three letters written by Mr. Buschman in June and July 1962 establish that a minimum three acre zoning provision was under discussion at that time and in a letter to Mr. Louis Smith in July of 1962 Mr. Buschman indicated his delight at learning that a Massachusetts precedent for the three acre provision had been discovered.

In July 1962 formal zoning standards were promulgated by the Secretary. They required that undeveloped areas of the Seashore be preserved in their natural state "to the extent possible under Massachusetts law" 27 F.R. 6714. The revised suggested minimum zoning requirements drafted by Mr. Buschman on September 26, 1962 contain a three acre zoning provision.

The evidence produced at the hearing on this motion establishes that at least three of the affected towns requested a less stringent zoning provision, i. e. smaller than three acre lot sizes, and that federal representatives consistently refused to back down from the three acre figure. The evi-

dence also established that at no time was the possibility of not passing a zoning bylaw even considered. Mr. Buschman testified that the attitude of the various townspeople was "this is something we have to do and let's get with it." Although there was no evidence that the town of Truro requested such a modification of the three acre provision, testimony adduced at the hearing established that the Truro Planning Board understood that a bylaw providing for anything less than three acre zoning would not be approved by the Secretary and that they must either adopt a three acre provision or live with the risk of condemnation.

In light of the foregoing, it is not surprising that the town of Truro unanimously voted at the town meeting to enact a bylaw which changed the zoning within the Truro-Seashore area from ½ acre to three acre zoning in February 1963. The provision adopted was a verbatim replica of the suggested draft which had been presented to the town by Mr. Buschman. The bylaw was approved by the Secretary and the power of the Secretary to condemn improved property within the Truro-Seashore was thereby suspended as to the improved property upon which construction had commenced prior to September 1, 1959.

Between 1972 and 1974 the United States filed condemnation actions against thirty-six tracts of unimproved property within the Truro-Seashore. The controversy now before the court stems from the fact that those unimproved properties are subject to both the condemnation power of the Secretary and the new three acre zoning provision which had been enacted by the town of Truro and approved by the Secretary.[4] The owners of those thirty-six tracts have filed two motions in which they seek to have the Truro zoning bylaw set aside for the limited purpose of determining the fair market value of their land and seek to have the fair

---

4. The evidence adduced at the hearing established that in many cases the value of such properties was reduced by 20%–60% as a result of the new zoning bylaw. This diminution in value is explained by the fact that only one house is "buildable" on a three acre lot whereas prior to the new zoning provision six houses

could be built on three acres. Indeed, because a minimum of three acres is required before a house may be built, a landowner with a five acre tract could still build only one house on that lot while prior to the new zoning provision he could have divided the same piece of land into ten house lots.

market value of their land determined pursuant to what the zoning provision would have been in the absence of federal intervention and suggest that the ¾ acre zoning provision which regulates that portion of Truro not within the Seashore between 1972 and 1974 when the lands were taken should be applied.

The landowners argue that the United States as the condemning authority should not be allowed to take advantage of the diminution in property value which resulted from the enactment of the bylaw in determining the fair market value of their properties because the new zoning bylaw was "in large part motivated, induced and implemented" by agents of the United States. They do not contend that the zoning bylaw is invalid or that it constituted an inverse condemnation of their property but merely maintain that since the town's adoption of the three acre zoning provision was an integral part of the federal design, the federal government should not be allowed to profit from the decreased property values which that bylaw effected.

The government relies on *United States v. Miller,* 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943) and *United States v. Eden Memorial Park Assoc.,* 350 F.2d 933 (9th Cir. 1965) as clear authority for its position that a taking authority is required to pay the fair market value on the date of the taking, subject to the applicable zoning regulations. It points to the unanimous vote of the Truro town meeting and argues that the zoning provision is the result of local and not federal action. The government maintains that no basis in law exists for setting aside a zoning bylaw for "a limited purpose" and argues that the motion before the court represents an attempt by the landowners to make an end run around their inability to attack the validity of the zoning bylaw and to show that adoption of the zoning bylaw constituted an inverse condemnation of the land in question. While the court will concede that the motion now under consideration is a novel one, it is one which has been fashioned to meet the needs of a novel situation.

It is clear that a valid three acre zoning provision was in effect in Truro between 1972 and 1974, the time period during which the relevant takings occurred. However, the extensive federal involvement which preceded the town's adoption of that bylaw distinguishes the facts of this case from those in *United States v. Eden Memorial Park Assoc., supra* where there was no connection between the taking authority and the applicable zoning regulation.

Although as a general proposition we accept the *Eden* rule, the three acre zoning provision which was in effect in Truro at the time of the taking should not be applied on these facts. In the case at bar the adoption of the Truro zoning provision from day one of the Seashore Park project was an integral part of the federal scheme which had as one of its main goals to preserve the Cape Cod way of life. It took the Congress of the United States, the Secretary of the Interior and several federal representatives to insure that the town of Truro delivered exactly what was expected of it. Under the facts set forth above I rule that the federal government cannot disavow the nexus which exists between its actions and the adoption of the Truro zoning provision. It is clear both from the statutory language and the evidence presented at the hearing that Congress made an offer which Truro realistically could not refuse. To characterize the enactment of the three acre zoning provision as the totally free act of the Truro citizenry at town meeting would be to shut ones eyes and ears to what really went on.

The fifth amendment requires that the government pay "just compensation" for lands taken and the word "just" evokes "ideas of 'fairness' and 'equity'". *United States v. Commodities Corp.,* 339 U.S. 121, 70 S.Ct. 547, 94 L.Ed. 707 (1950) which are inconsistent with the application of the *Eden* rule in this case. As discussed above the adoption of the three acre zoning provision was induced by federal action. The federal government should not be allowed to benefit from any fluctuation in market value resulting therefrom.

This ruling is in keeping with the rationale applied by the Supreme Court in cases where changes in market value are attributable to the federal project itself. *Almota Farmers Elevator & Warehouse Co. v. United States,* 409 U.S. 470, 93 S.Ct. 791, 35 L.Ed.2d 1 (1973); *United States v. Reynolds,* 397 U.S. 14, 90 S.Ct. 803, 25 L.Ed.2d 12 (1969); *United States v. Virginia Electric Co.,* 365 U.S. 624, 81 S.Ct. 784, 5 L.Ed.2d 838 (1960); *United States v. Miller, supra; Shoemaker v. United States,* 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170 (1892); *Kerr v. Park Commissioners,* 117 U.S. 379, 6 S.Ct. 801, 29 L.Ed. 924 (1886).

In *United States v. Miller, supra* 317 U.S. at 375, 63 S.Ct. at 280, the Supreme Court cautioned that "strict adherence to the criterion of market value may involve inclusion of elements which, though they affect such value, must in fairness be eliminated in a condemnation case . . ." Specifically the court held that in determining the value of land which has probably been within the scope of a project[5] from the time the government first became committed to the project, the taking authority need not consider any enhancement in the value of the property which is attributable to the project itself.

The court has also recognized that the converse is true. *United States v. Reynolds, supra; United States v. Virginia Electric Co., supra*

> It would be manifestly unjust to permit a public authority to depreciate property values . . . and then to take advantage of this depression in the price which it must pay for the property.
> *United States v. Virginia Electric Co., supra* 375 U.S. at 636, 81 S.Ct. at 792.

The thirty-six properties at issue in the instant case are all within the confines of the Cape Cod National Seashore which were clearly established by Congress. 16 U.S.C. § 459. I rule therefore that they fall within the test set out by the Supreme Court in *United States v. Miller, supra* in that they were probably within the scope of the federal project from the outset. I further rule that any fluctuation in property value which has resulted from the three acre zoning provision is a fluctuation which is attributable to the federal project itself and therefore that the three acre provision should not be considered in determining the fair market value of the land in question. I further rule that the ¾ acre zoning provision which was in effect in those portions of Truro outside the Seashore at the time of the takings should be applied in determining the fair market value of the thirty-six tracts.

---

5. The Supreme Court has ruled that property is probably within the scope of a project when it lies within the area in which Congress has authorized the appropriation of acreage. Thus when it is likely from the outset that the land will be taken it is probably within the scope of the project even if it might not ever be taken. *United States v. Miller, supra; Shoemaker v. United States, supra.*