Carroll
No. 2002-667

CLARE T. DALY

v.

THE STATE OF NEW HAMPSHIRE

CLARE T. DALY, TRUSTEE, THE PINES LODGE REALTY TRUST

v.

THE STATE OF NEW HAMPSHIRE

CARROLL COUNTY LEASING CO. *& a.*

v.

THE STATE OF NEW HAMPSHIRE

Argued: September 17, 2003
Opinion Issued: November 24, 2003

*Cooper, Deans & Cargill, P.A.*, of North Conway (*Randall F. Cooper* on the plaintiffs' joint brief and orally), for plaintiffs Clare T. Daly and Clare T. Daly, Trustee, The Pines Lodge Realty Trust.

*Dewhurst & Greene, P.L.L.C.*, of Bedford (*Arthur G. Greene* and *Glenn A. Perlow* on the plaintiffs' joint brief, and *Mr. Greene* orally), for plaintiffs Carroll County Leasing Co. and Chick Lumber, Inc.

*Peter W. Heed*, attorney general (*Mark P. Hodgdon*, senior assistant attorney general, on the brief and orally), for the State.

NADEAU, J. The plaintiffs, Clare T. Daly (Daly); Clare T. Daly, Trustee, The Pines Lodge Realty Trust (Pines Lodge); Carroll County Leasing Co. and Chick Lumber, Inc. (collectively Chick Lumber), appeal an order of the Superior Court (*O'Neill*, J.) denying their motion to introduce evidence and ruling that, in determining just compensation for takings by the State, the plaintiffs' property must be valued without considering changes made by the Town of Conway to its zoning ordinance. We affirm.

This appeal involves the valuation of three properties, portions of which were taken by the New Hampshire Department of Transportation (DOT) in connection with a highway project undertaken to alleviate traffic congestion on the Route 16 corridor in Conway and North Conway. The project involved upgrading Routes 16 and 302, constructing a limited access bypass, and other improvements.

Obtaining approval for the project required issuance of a Final Environmental Impact Statement (FEIS), which DOT prepared in cooperation with the Federal Highway Administration (FHA). The FEIS for the bypass was approved on December 22, 1995. The project also required a wetland or dredge and fill permit from the United States Army Corps of Engineers, which was issued on December 19, 1995.

Prior to the issuance of these approvals, the Environmental Protection Agency (EPA) Region I had suggested that it would consider using its "section 404(c) veto" power to protect the Page Randall Brook and Conway Lake areas from secondary impacts from the project. This veto power refers to the EPA's authority, under the Clean Water Act, to

prohibit discharge of dredged or fill material into a specified wetland location when it determines that such discharge "will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas," 33 U.S.C. § 1344(c) (2000). The EPA failed to commence veto proceedings, however, and the project was begun in 1995.

In 1997, the Town of Conway (Town) began to consider making changes to its land use ordinances. It hired Glenn Harbeck, a community planning consultant, to assist in the process. Harbeck was paid, in part, with funds supplied by the EPA. Harbeck prepared a report recommending that the Town establish two new districts: a special highway corridor district that would restrict development within 500 feet of the highway, and a wetlands district that would impose a 100-foot vegetative buffer around wetlands. The Town adopted these measures in March 1999.

Between December 28, 1999, and February 29, 2000, DOT acquired the portions of the properties at issue. In separate proceedings, Daly, Pines Lodge and Chick Lumber petitioned the superior court to reassess damages for the takings, *see* RSA 498-A:27 (1997), arguing that the zoning changes establishing the special highway corridor and wetlands districts should have been considered in valuing the remainders of their properties left after the takings. The cases were consolidated and the common issue of "whether or not the [plaintiffs are] entitled to compensation for the diminution in value of the remainder of the land caused by both the Wetlands Protection District and the Special Highway Corridor District" was bifurcated for preliminary determination. The trial court ruled that the properties "must be valued without regard to the zoning changes adopted by the Town of Conway in 1999." This appeal followed.

Under the settled law of the State, "in eminent domain proceedings the owner of land condemned is entitled to damages for the taking measured by the difference between the value of his land after the taking, and what it would have been worth on the day of the taking if the taking had not occurred." *Edgcomb Steel Co. v. State*, 100 N.H. 480, 486-87 (1957). In determining value, the owner is entitled to have the property appraised at the most profitable or advantageous use to which it could be put on the day of the taking. *Id.* at 487. The value to be ascertained is fair market value, which is "the price which in all probability would have been arrived at by fair negotiations between an owner willing to sell and a purchaser desiring to buy, taking into account all considerations that fairly might be brought forward and reasonably be given substantial weight in such bargaining." *Id.* (quotation omitted).

"In the context of a partial taking, the property owner is entitled to not only the fair market value of the property actually taken, but also compensation for the effect of the taking, if any, on the entire property," which is referred to as severance damages. *City of Manchester v. Airpark Business Ctr. Condo. Unit Owners' Assoc.*, 148 N.H. 471, 473 (2002). The preferred method in this State for determining condemnation damages, including severance damages, in partial takings cases is the "before and after" method, "whereby the value of the remainder of the tract after the taking is deducted from the value of the whole tract before the taking." *Lebanon Housing Auth. v. National Bank*, 113 N.H. 73, 75-76 (1973). This method automatically takes account of severance damages. *Id.* at 76.

The plaintiffs argue that just compensation for the partial takings of their properties must include "the diminution of value [of the remainders] based on the development restrictions imposed by the [zoning] ordinances." In other words, the plaintiffs contend that the effect of the zoning changes should be considered in the "after" valuations of their properties, but not the "before" valuations. The State, on the other hand, argues that the effect of the zoning changes should be ignored in both the before and after valuations, or, alternatively, should be considered in both valuations.

"Evidence of the effect of zoning restrictions is generally admissible in determining the value of property taken by eminent domain." *Manchester Airport Authority v. Romano*, 120 N.H. 166, 167 (1980). Nevertheless, zoning changes "resulting from the fact that the project that is the basis for the taking was impending, cannot be taken into account in valuing the property in the condemnation proceeding." 4 J. SACKMAN, NICHOLS ON EMINENT DOMAIN § 12C.03[2], at 12C-77 (3d ed. rev. 2003). This principle has been stated to be an application of "the familiar rule that property taken by condemnation proceedings should be valued irrespective of the effects of the improvement upon it," *Masheter v. Kebe*, 295 N.E. 2d 429, 431 (Ohio Ct. App. 1973), a proposition we have recognized as being the general rule, *see Fusegni v. Portsmouth Housing Auth.*, 114 N.H. 207, 209 (1974). The rationale for the rule is that it "neutralizes the effect of the project for which the property was condemned. The condemnee neither gets the benefit of increased valuation nor is left with decreased valuation due to the condemnation project." *Paradise Valley v. Young Financial Serv.*, 868 P.2d 971, 974 (Ariz. Ct. App. 1993).

The State asserts that "there is no dispute that the Town of Conway's adoption of the Highway and Wetland Overlay Districts were directly

influenced by the State's proposed Bypass project." It therefore argues for application of the rule that zoning changes influenced by the project should be ignored in valuing the property for purposes of compensation. The plaintiffs go further, arguing that the new zoning ordinances were "an integral part" of the bypass project. Specifically, the plaintiffs contend that "Town officials and the public were coerced into passing [the zoning ordinances] under threat of an EPA veto of the Bypass project." They argue:

> Since the zoning amendments at issue here were adopted by the Town of Conway to satisfy the requirement from the EPA to mitigate for secondary impacts resulting from construction of the Conway Bypass, their [e]ffect on the value of Condemnees' remaining property must be compensated for just as if they were tangible elements of the project....

In support of their position, the plaintiffs cite *United States v. Certain Lands in Truro, Barnstable County, Commonwealth of Massachusetts*, 476 F. Supp. 1031 (D. Mass. 1979), which they assert presented facts "remarkably similar" to those at issue here. *Truro* involved legislation enacted by Congress to preserve the scenic, historic and scientific character of a portion of Cape Cod, Massachusetts, by protecting it from further development. *See id.* at 1032. While a zoning ordinance would have been the most logical means by which to achieve these goals, Congress does not have the power to enact local zoning ordinances. *See id.* Therefore, Congress enacted legislation providing that improved property within the protected portion of Cape Cod would not be subject to taking by the federal government if the town in which the property was located adopted a zoning bylaw sanctioned by the Secretary of the Interior. *See id.* at 1032-33. If, on the other hand, an improved property was used in violation of the bylaw or was subject to a variance from the bylaw, or if the town failed to adopt an approved bylaw, the property was subject to taking. *See id.* at 1033.

The *Truro* court found that by enacting this legislation, "Congress motivated, and, as a practical matter, pressured the six affected towns to enact the zoning provisions which Congress itself was powerless to enact and at the same time reserved to the federal government . . . the power to approve or disapprove each provision." *Id.* at 1033-34. Under this pressure, the Town of Truro enacted a bylaw changing the minimum size of a buildable lot from one-half acre to three acres. *See id.* at 1034, 1034 n.4.

After enactment of the Truro bylaw, the federal government instituted condemnation proceedings against thirty-six unimproved properties in the

town. The owners of the properties filed motions to have the three-acre zoning bylaw "set aside for the limited purpose of determining the fair market value of their land and [sought] to have the fair market value of their land determined pursuant to what the zoning provision would have been in the absence of federal intervention." *Id.* at 1034-35. They did not challenge the validity of the bylaw or claim that it effected an inverse condemnation of their land; rather they argued that "since the town's adoption of the three acre zoning provision was an integral part of the federal design, the federal government should not be allowed to profit from the decreased property values" resulting from the bylaw. *Id.* at 1035.

The court agreed with the owners that the adoption of the bylaw "was an integral part of the federal scheme," noting that "Congress made an offer which Truro realistically could not refuse." *Id.* The court held that "the federal government cannot disavow the nexus which exists between its actions and the adoption of the Truro zoning provision," *id.*, and concluded that the bylaw should not be applied in valuing the subject properties. *Id.* at 1036.

Similarly, the plaintiffs here argue that the highway corridor and wetlands ordinances were "conceived, motivated and induced by the EPA and became an integral part of the Conway Bypass project" and that DOT must therefore compensate them for the effects of those ordinances. The trial court found, however, that the ordinances "were not a necessary or integral part of the bypass project." The trial court cited evidence that DOT representatives attended a 1997 Town meeting "strictly as a courtesy" and that the DOT Commissioner considered any reopening of bypass issues at the meeting to be inappropriate, as DOT already had all approvals and permits necessary for the project. The trial court concluded that DOT "never considered the bypass project contingent upon the Town's adoption of the zoning ordinances." The court also found that the Town adopted the ordinances as its "sole decision" and that the evidence did not support a finding that the EPA would have vetoed the bypass project if the zoning ordinances were not enacted.

The trial court's conclusion that the ordinances were not an integral part of the bypass project is a factual finding that we must uphold unless "clearly erroneous or unsupported by the evidence." *Whitcomb v. Peerless Ins. Co.*, 141 N.H. 149, 151 (1996). We need not review this finding, however, because, seeing a more fundamental legal flaw in the plaintiffs' claim, we affirm the trial court's decision on different grounds. *Cf. Mathena v. Granite State Ins. Co.*, 129 N.H. 249, 251 (1987).

While this case does bear some factual resemblance to *Truro*, namely, a federal governmental entity allegedly pressuring a town to adopt local

zoning provisions, there is an important difference: in *Truro* the condemnor and the pressuring federal authority were the same entity, while here the condemnor is the State DOT and the alleged pressuring agency is the federal EPA. *Truro* may be seen as simply an application of the rule that a public authority will not be permitted to depress property values by its pre-taking actions and then take advantage of the depressed values in compensating for the taking. *See Truro*, 476 F. Supp. at 1036. As the *Truro* court stated: "[T]he adoption of the three acre zoning provision was induced by *federal action*. The *federal government* should not be allowed to benefit from any fluctuation in market value resulting therefrom." *Id.* at 1035 (emphasis added). The same rule has been expressed as follows:

> [E]vidence of a zoning restriction is inadmissible to show a lower value to the condemned property where (1) the restriction is imposed to freeze or depress the value of land that a governmental agency seeks to condemn, and (2) *the same entity is both the condemner and the authority responsible for that restriction.*

*San Diego v. Rancho Penasquitos Partnership*, 130 Cal. Rptr. 2d 108, 122-23 (Ct. App. 2003) (emphasis added).

In *The People of the State of California, acting By and Through the Department of Public Works v. Southern Pacific Transportation Co.*, 109 Cal. Rptr. 525 (Ct. App. 1973), the court explained the reasoning behind the rule and, more importantly for the instant case, why the rule does not apply when the zoning and condemning entities are not the same. The court first noted that a zoning ordinance enacted to lower a property's value in anticipation of a future taking constitutes an inverse condemnation giving rise to a cause of action against the zoning authority. *See id.* at 528-29. The court then stated:

> It is practical and logical to require that such invalid zoning be disregarded where the zoning authority is also the condemnor. Permitting recovery in eminent domain disregarding the zoning restriction combines in one action the right to recover compensation for both the inverse condemnation resulting from the disguised taking in the form of zoning and for the actual taking of the property. The process avoids separating the matter into two causes involving the same subject matter and the same parties. . . .

> In contrast, logic dictates that the combination of causes of action is improper [where the zoning and condemning authorities are different entities, in this case, a city and the state]. To require that the city's zoning which was an inverse condemnation by that body be disregarded here shifts the financial burden of the disguised taking from the city to the state. It permits a condemnee which failed to pursue its remedies for inverse condemnation against the city to recover compensation from an entity not directly responsible for the damage compensated.

*Id.* at 529.

Similarly, the plaintiffs here seek to shift the financial responsibility for alleged damages caused by the Town's enactment of the highway corridor and wetlands ordinances onto DOT. Even if we took the *Truro* logic as far as it goes in this case to impute responsibility for the zoning ordinances to the EPA, the plaintiffs would still be seeking to shift responsibility from the EPA to DOT, a totally separate entity.

The plaintiffs attempt to avoid this problem by portraying the EPA and DOT as "partners" in the bypass project. They argue that "[a]s a partner and the representative of the Federal Government in this project, [DOT], with funding provided in a substantial part by [FHA], bears the constitutional responsibility for justly compensating the Condemnees for all compensable damages relating to the Bypass project."

The plaintiffs attempt to support this position with a DOT brochure entitled "Public Highways and your Property," testimony by DOT project manager Donald Lyford, largely regarding the brochure, and two findings of fact by the trial court. The DOT brochure's stated purpose is to provide prospective condemnees with "general information regarding relocation assistance advisory services and relocation payments." In a brief introductory section, it describes a "federal-state partnership" between the United States Department of Transportation and the New Hampshire DOT designed to (1) carry out the constitutional mandate to the federal government "to establish post roads (for the transportation of mail), provide for the national defense, and promote the general welfare," and (2) comply with State laws regarding similar duties of the State transportation commissioner. Thus, it describes the federal department of transportation's role in reviewing the planning and construction of state highway projects and the provision of federal financial aid to such projects. Nowhere does the brochure mention the EPA or any environmental protection or mitigation goals. Mr. Lyford's testimony acknowledged statements in the brochure and added only that the EPA was one of

"several Federal agencies involved throughout the project as sort of reviewing agencies."

The first finding of fact relied upon by the plaintiffs merely describes the bypass as "a federal-state partnership transportation project that is being substantially funded by the [FHA]." The second finding is that "[t]he project became a joint effort of the [DOT], the [FHA], the U.S. Army Corps of Engineers[,] . . . the [EPA] and the Town of Conway." Despite the broad language of the second finding, it does little, without explanation or elaboration, to prove the kind of relationship between the EPA and DOT that the plaintiffs seek to establish. We conclude that all of the evidence proffered by the plaintiffs on this point is insufficient, as a matter of law, to prove a relationship between the EPA and DOT that would permit imputing liability from the former to the latter. *Cf. City National Bank of Miami v. United States*, 33 Fed. Cl. 224, 231 (1995).

Accordingly, under the reasoning of *Southern Pacific Transp. Co.*, 109 Cal. Rptr. 525, the plaintiffs cannot recover, in this action against the State, damages for the effects of the highway corridor and wetlands ordinances. We need not address whether the plaintiffs could bring a separate takings action against the town or the EPA. *But cf. Quirk v. Town of New Boston*, 140 N.H. 124, 130 (1995); *De-Tom Enterprises, Inc. v. U.S.*, 552 F.2d 337, 339-40 (Ct. Cl. 1977).

The plaintiffs also contend that the trial court erred in not allowing into evidence certain documents obtained from the EPA's files. The trial court ruled that the documents were inadmissible because they did not fall within either an exception to the hearsay exclusion or the "catchall exception" of New Hampshire Rule of Evidence 803(24).

"We review the trial court's rulings on admissibility of evidence for an unsustainable exercise of discretion, reversing only if the rulings are clearly untenable or unreasonable to the prejudice of the [plaintiffs'] case." *Madeja v. MPB Corp.*, 149 N.H. 371, 390 (2003). We need not review the substance of the trial court's rulings in this case, however, because we agree with the State's argument that even if the trial court erred in excluding the evidence, any error would be harmless.

The plaintiffs assert that the proffered documents "demonstrated beyond doubt their contention that the EPA coerced the Town of Conway into adopting the two ordinances in issue in order to satisfy its requirement for mitigation of impacts from the Conway Bypass project." Under our holding above, however, even if the plaintiffs proved this contention, their claim would still fail for lack of a basis for holding DOT

liable for the EPA's actions. Thus, exclusion of these documents did not prejudice the plaintiffs' case.

*Affirmed.*

BROCK, C.J., and BRODERICK, DALIANIS and DUGGAN, JJ., concurred.