NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Rockingham
No. 2019-0121

TORROMEO INDUSTRIES

v.

STATE OF NEW HAMPSHIRE

Argued: January 14, 2020
Opinion Issued: March 13, 2020

Sumner F. Kalman Attorney at Law, PC, of Plaistow (Sumner F. Kalman on the brief and orally), for the petitioner.

Gordon J. MacDonald, attorney general (Emily C. Goering, assistant attorney general, on the brief and orally), for the State.

HICKS, J. The State appeals an order of the Superior Court (Schulman, J.) on a petition filed by Torromeo Industries (Torromeo) for the reassessment of eminent domain damages. See RSA 498-A:27 (2010). The court awarded Torromeo $70,800 in condemnation damages. We vacate and remand.

I. Facts

The trial court found, or the record establishes, the following relevant facts. Torromeo owns several acres of land in Plaistow on which there is a 4,000 square foot light industrial building and a 1,500 square foot single-

family residence. The property is located in the town's "Industrial I" zone. Lots in that zone must have 80,000 square feet (equivalent to 1.84 acres) and 150 feet of road frontage.

Before the taking at issue, Torromeo's lot consisted of 11.88 acres with approximately 149 feet of frontage. Of those 11.88 acres, the residence occupied approximately .36 acres and the light industrial use occupied approximately 2 acres, leaving approximately 9.52 acres for potential development. The residence rented for $1,500 monthly, net of utilities, and the .36-acre portion of the lot on which it sat had approximately 100 feet of the entire lot's 149 feet of frontage. Before the taking, the property could be accessed by vehicle only by way of a private driveway.

Although the property's 149 feet of frontage did not comply with the zoning ordinance, according to the State's appraiser and not disputed by Torromeo's appraiser, it "was approved by the Planning Board in 1989 and is considered to be a legally permitted pre-existing use." Moreover, although residential uses are not allowed in the Industrial I zone, approximately .36 acres of Torromeo's property have been continuously used as such for approximately 70 years, and the residential use is deemed a lawful, preexisting, nonconforming use.

In 2015, the State took approximately 1.9 acres of Torromeo's land by eminent domain to construct a two-lane, paved service road. To complete the project, the State also took approximately 30,000 square feet for permanent and temporary easements. As a result of the taking, Torromeo's property became three independent parcels: (1) a .36-acre lot on which the residence sits; (2) an approximately 10-acre site on which the light industrial building sits and of which approximately 6.55-to-8 acres are considered to be surplus land; and (3) a .28-acre "gore" or uneconomic remnant.

The State offered Torromeo $500 as just compensation for the taking. Torromeo declined the offer and sought a determination of condemnation damages from the New Hampshire Board of Tax and Land Appeals (BTLA). See RSA 498-A:24-:26 (2010). Thereafter, the State offered, consistent with the view of its appraiser, and the BTLA ordered, $35,000 in just compensation. Torromeo petitioned the superior court for de novo review of the BTLA award. See RSA 498-A:27.

A. State's Expert

Both parties submitted appraisal reports from their experts, who were the only witnesses at the bench trial. The State's expert opined that the property's highest and best use before the taking was as improved by the single-family residence and light industrial building, with the surplus land being held for future development. The expert explained that, although the

2

property could be further developed, such as by converting it "to condominium ownership," which would involve the creation of "a private road . . . to allow development of the remainder of the lot," doing so might not be financially feasible given the market.

The State's expert opined that the property's highest and best use after the taking was to hold the surplus land for future development and to continue to use .36 acres of the property for the residential use and the remaining land for the light industrial use. However, the expert further opined that the highest and best use of the property was as a "de facto subdivision." He explained that the service road, to be constructed as part of the taking, will separate the residential lot from the remaining land. He testified that, although the residential lot had not yet become "a lot of record," it could easily become one simply by filing a deed and a survey with the registry of deeds. He stated that "according to the Code Enforcement Officer for the Town, making the site a lot does not require a subdivision or variance due to the 'de facto' subdivision of the site resulting from the construction of the service road, separating the .36 site from the parent lot." Rather, "[t]he lot would be created and recognized by the Town by filing a survey and deed, with a legal description." Moreover, he explained that, according to the zoning ordinance, "[i]f a lot of record . . . has . . . a portion . . . taken by eminent domain for a public good, then if it becomes . . . nonconforming, it is an allowable lot."[1] Thus, he opined, after the taking, the residential lot "could be separately transferred . . . , something that would not have been possible in the 'Before' scenario due to the dimensional requirements imposed by zoning, unless relief [was] granted from the applicable ordinances."

The State's expert further testified that he did not assume that, before the taking, the lot would have received the necessary relief from zoning requirements because town officials had informed him that it "was unlikely if not impossible" that such relief would have been granted. The expert also testified that, generally, when he performs an appraisal, he does not assume that a variance will be granted; rather, he appraises property "as is based on current zoning and the information from the code officer and the planning director." Nor did the State's expert assume that, before the taking, the residential lot would have received subdivision approval. The State's expert testified that "the code enforcement officer and the planning director" told him that the possibility of subdividing the residential lot from the remaining land, before the taking, "was remote."

---

[1] See Plaistow, N.H., Zoning Ordinance, art. V, § 220-39 (2019) ("No lot shall be so reduced in area that the area, yards, lot width, frontage, coverage or other requirements of this chapter shall be less than herein prescribed for each district. The provisions of this section shall not apply when part of a lot is taken for a public purpose.")

Relying upon the residential portion of the property's rental value and using the income capitalization approach to value, the State's expert opined that, before the taking, the residential portion was worth $155,000. To obtain this value, the expert used the current rental rate for the property ($1,500/month), applied a 5% vacancy and collection loss, deducted the projected operating costs, and estimated that the net income derived from the rental is $11,600. Using a capitalization rate of 7.5%, the expert divided the projected net operating income by the selected capitalization rate.

The State's expert did not use the income approach to value the residential lot after the taking because he assumed that, after the taking, the residence "would be sold," and, therefore, he used the sales comparison approach to estimate its selling price. Under that approach, the residential lot's value after the taking was $190,000. Ultimately, the State's expert opined that the surplus land sustained approximately $70,000 in damages, which was offset by the approximately $35,000 that the value of the residential lot increased as a result of becoming a separate, saleable lot after the taking.

## B. Torromeo's Expert

Torromeo's expert opined that the highest and best use of the property both before and after the taking was as a subdivision, with the residential lot being separated from the remaining land. He testified that, before the taking, "you could do exactly the same thing as you could accomplish" after the taking "by isolating the residence and the [light] industrial [use] through condominiumization." In his opinion, whether variances could have been obtained, before the taking, to allow this to occur "is almost irrelevant." The expert noted that "[c]ondominium ownership is subject to the subdivision regulations," but did not discuss the probability that subdividing the property through "condominiumization" would have been approved under those regulations before the taking.

Using the sales comparison approach, Torromeo's expert opined that the residential part of the property (including the dwelling) was worth $237,500 before the taking, and $112,500 after the taking. Using the cost approach to value, Torromeo's expert opined that the "before taking" value of the residential lot was $184,000, and its "after taking" value was $70,000. Although Torromeo's expert also calculated the value of the property under the income capitalization approach to value, he did not provide separate values for the residential and industrial lots, and gave no weight to that approach in his final calculations.

## C. The Trial Court

At the bench trial, the court expressed skepticism that Torromeo's land could not have been subdivided before the taking:

THE COURT:  The other question that I had, and I still have it, is looking at the before [taking value of the lot], there's that residential area.  It's separated from the abutter by a driveway that's used by -- for light industrial use, but for an industrial use, that driveway is there.  I understand it's not the same as this big, beautiful road with the sidewalks and the curves and the drainage.

Well, there's a driveway that's there already.  To me, it's a little bit inconceivable that if the landowner went to the planning board and said, I'd like a subdivision waiver to carry on what's already de facto there.  The house is there.  It's been there since the 1950s.  The rest of [it is] an industrial site.  It's been there since whenever, but a long time, judging from the building that we all saw.  That they wouldn't get that, and they wouldn't get a variance based on the very unique nature of that property.

. . . .

. . . I mean, I'm just kind of thinking if that case came here for an appeal from the denial of the subdivision waiver or denial of the zoning variances, what would this Court do under the applicable case law.  And I guess, I think we'd probably grant the waiver and variances.

Following the hearing and a view of the property, the trial court accepted the State's appraisal <u>except</u> as it related to the residential portion of the property.  The court found "that the highest and best use, <u>both before and after the taking</u>," of the residential portion of the property, "is as a salable residential lot."  The court found that, although "[w]aivers and variances would be required (both before and after the taking) because the . . . residential lot is undersized" for the Industrial I zone, the residential lot's dimensions are "in keeping with the character of the surrounding neighborhood."

The court further decided that "Torromeo would be entitled to subdivision [regulation] waivers and zoning variances for the limited purpose of continuing the existing use on the existing <u>de</u> <u>facto</u> lot."  To support that determination, the court found that "changing [the residential lot's] legal status from an ersatz lot to a real one would not alter the nature of the neighborhood," or increase the intensity of the residential use on the lot.  Nor would it have any "effect on property values, traffic, access to utilities, or congestion."

Given the trial court's view that the residential portion could have become a separate, saleable lot both before and after the taking, the court rejected the State appraiser's opinion that the taking increased the portion's value.  The court found that, in fact, the value of the residential lot remained the same, both before and after the taking.  The court stated:

5

> The State's appraiser opined that the saleable residential lot has a value [under the sales comparison method of appraisal] of $190,000.

> There is nothing in the State's appraisal report, or the appraiser's testimony, that suggests that the value of the residential land as a saleable lot would have been any greater prior to the taking. In other words, . . . if the [residential] lot had been subdivided out of the property prior to the taking, its 'before' value would have been $190,000.

The court, therefore, awarded Torromeo $70,800 as just compensation for the taking, based upon the State's expert's opinion that the taking caused $70,000 in damages to the surplus land, and upon the $800 value the court gave to a temporary construction easement. The State unsuccessfully moved for reconsideration, and this appeal followed.

## II. Analysis

"The law has long been settled in this jurisdiction that in eminent domain proceedings the owner of land condemned is entitled to damages for the taking measured by the difference between the value of his land after the taking, and what it would have been worth on the day of the taking if the taking had not occurred." Edgcomb Steel Co. v. State, 100 N.H. 480, 486-87 (1957). "In determining value, the landowner is entitled to have the property appraised at the most profitable or advantageous use to which it could be put on the day of the taking," Daly v. State, 150 N.H. 277, 279 (2003), also known as its highest and best use, see Steele v. Town of Allenstown, 124 N.H. 487, 490 (1984). The value to be ascertained is fair market value, which is "the price which in all probability would have been arrived at by fair negotiations between an owner willing to sell and a purchaser desiring to buy, taking into account all considerations that fairly might be brought forward and reasonably be given substantial weight in such bargaining." Daly, 150 N.H. at 279 (quotation omitted). "Determination of fair market value is an issue of fact, and we will not disturb a finding by a trial court unless it is clearly erroneous or unsupported by the evidence." Society Hill at Merrimack Condo. Assoc. v. Town of Merrimack, 139 N.H. 253, 255 (1994).

Fair market value is generally determined by one of the following appraisal methods: (1) the sales comparison approach, which establishes value by comparing the appraised property to similar properties that have recently sold, see Appeal of Pennichuck Water Works, 160 N.H. 18, 38 (2010); (2) the income capitalization approach, which "determines value by measuring a property's worth on the basis of its capacity to generate future rental income,"

Rollsworth Tri-City Trust v. City of Somersworth, 126 N.H. 333, 336 (1985); and (3) the reproduction less depreciation or cost approach, where the appraiser determines the value of the land without the buildings and then adds to that sum the depreciated current cost of reconstructing the buildings, see State v. 3M Nat'l Advertising Co., 139 N.H. 360, 362-63 (1995); see also Appeal of Pennichuck Water Works, 160 N.H. at 38. All three approaches are valid, but also have weaknesses. See Appeal of Pennichuck Water Works, 160 N.H. at 38. "We have never attempted to tie the fact finder's hands with a rigid fair market value formula in the absence of legislative directive." Id. (quotation, brackets, and ellipsis omitted). "Rather, judgment is the touchstone." Id. (quotation omitted).

"In the context of a partial taking, the property owner is entitled to not only the fair market value of the property actually taken, but also compensation for the effect of the taking, if any, on the entire property," which is referred to as severance damages. Daly, 150 N.H. at 280 (quotation omitted). In an eminent domain proceeding involving a partial taking, the preferred method for determining condemnation damages is the "before and after" method, under which "the value of the remainder of the tract after the taking is deducted from the value of the whole tract before the taking." N.H. Dep't of Transp. v. Franchi, 163 N.H. 797, 798 (2012) (quotations omitted). Using the "before and after" method automatically accounts for severance damages. Id. at 799 (quotation omitted).

"'[J]ust compensation cannot be predicated upon potential uses which are speculative and conjectural.'" Boyle v. City of Portsmouth, 172 N.H. ___, ___ (decided January 24, 2020) (slip op. 11) (quoting United States v. 320.0 Acres of Land, More or Less, Etc., 605 F.2d 762, 814 (5th Cir. 1979)). "Rather, evidence of the specific highest and best use of condemned land is only relevant if the use is likely to be 'reasonably probable' in the reasonably near future." Id. at ___ (slip op. at 11) (quoting United States v. 33.92356 Acres of Land, 585 F.3d 1, 7 (1st Cir. 2009)). "The principle that just compensation cannot be predicated upon potential uses which are speculative and conjectural . . . is but the converse of the principle . . . that just compensation must take into account the highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future." 320.0 Acres of Land, 605 F.2d at 814 (quotation omitted). "This limitation ensures that the landowner is put in as good a position as he would have occupied if his property had not been taken, but that he does not profit from the condemnation." Tenn. Valley Auth. v. 1.72 Acres of Land in Tenn., 821 F.3d 742, 752-53 (6th Cir. 2016).

"Thus, "[i]f a claimed use is prohibited by zoning," then it must be shown "that it is reasonably probable that the relevant restrictions will be removed in the reasonably near future." 33.92356 Acres of Land, 585 F.3d at 7; cf. Boyle, 172 N.H. at ___ (slip op. at 11-12) (relying upon cases "in the analogous context

of condemnation proceedings where the property's asserted highest and best use depends upon the approval of variances or permits for its development," the court holds that the plaintiff failed to prove lost profits with reasonable certainty when his expert expressly declined to opine on the probability that the city would grant the necessary permits). For instance, in 33.92356 Acres of Land, 585 F.3d at 8, the court observed that given the defendant's concession "that, as zoned, the 34 acres could not legally be used for residential development or sand extraction without rezoning or some variance or permit by the Board," his expert's testimony could not be admitted unless the defendant showed "that there is a reasonable probability that the property would be rezoned or that a variance could have been obtained in the near future."[2]

The State challenges the trial court's determination that the residential lot could have become a separate, saleable lot before the taking, contending that this determination has no support in the evidentiary record. We agree. In order for the residential lot to have become a separate, saleable lot before the taking, the property would have had to have been subdivided. Whether that subdivision came about through condominium conversion or otherwise is immaterial because, as Torromeo's expert correctly observed, in Plaistow, "[c]ondominium ownership is subject to the subdivision regulations." Plaistow, N.H., Subdivision Regulations art. I, § 235-3 (2018) (defining a subdivision to include dividing land for the purpose of "condominium conveyance"), art. II, § 235-5 (2018) (providing that "[a]pproval of subdivision plats" by the planning board "is required before the land may be divided and . . . offered for sale, lease, or conveyance, including condominium conveyance"), art. III, § 235-12 (2018) ("Before any building permit for the erection of a structure, condominium conversion, subdivision of land, or lot line adjustment shall be granted, the owner or his agent shall make application for approval of such condominium conversion, lot line adjustment, subdivision, or site plan to the Planning Board of the Town of Plaistow, New Hampshire.").

The only evidence before the trial court regarding whether subdividing the property would have been reasonably probable before the taking came from the State's expert, who testified that the possibility of obtaining planning board approval to subdivide the land before the taking "was remote at best." He testified that town officials had informed him that, before the taking, it would

---

[2] At the same time, we recognize that even the chance of an improbable event can affect fair market value. United States v. 87.98 Acres of Land More or Less in County of Merced, No. Civ.F03-6064AWILJO, 2005 WL 2810641, at *10 (E.D. Cal. Oct. 25, 2005), affirmed on other grounds, 530 F.3d 899 (9th Cir. 2008). As the Ninth Circuit Court of Appeals has observed, "discovery in land of a reasonable probability of possible successful development of gas or oil gives great value to such land" and "has a market value even where the prospects of successful development are too speculative to be reasonably probable." Phillips v. United States, 243 F.2d 1, 6 (1957) (quotations and emphasis omitted). "Ultimately, review for reasonable probability must mean excluding evidence of valuation that would not be considered by business interests and the broader marketplace in general." 87.98 Acres of Land, 2005 WL 2810641, at *10.

have been "unlikely if not impossible" for the residential portion of Torromeo's land to be subdivided from the rest of the lot.  Although Torromeo's expert opined that the highest and best use of the property, before the taking, was as a subdivision, he did not discuss whether subdividing the property before the taking was reasonably probable, or specifically, whether there was a reasonable probability that Torromeo would have been able to secure all necessary waivers, approvals, and variances.  See Boyle, 172 N.H. at ___ (slip op. at 11).

Although as the trier of fact, the trial court was entitled to accept or reject such portions of the evidence as it found proper, including that of expert witnesses, Public Serv. Co. of N.H. v. Town of Bow, 170 N.H. 539, 542 (2018), the court was not entitled to, in effect, introduce its own evidence into the proceeding.  "It is axiomatic that a trial court cannot go outside of the evidentiary record except as to matters judicially noticed."  In the Matter of Rokowski and Rokowski, 168 N.H. 57, 61 (2015) (quotation and brackets omitted).  A court "may not introduce its own evidence into a proceeding."  In re Schrag, 464 B.R. 909, 914 (Bankr. D. Or. 2011); see United States v. Berber-Tinoco, 510 F.3d 1083, 1091 (9th Cir. 2007) ("While a resident judge's background knowledge of an area may inform the judge's assessment of the historical facts, the judge may not actually testify in the proceeding or interject facts (excluding facts for which proper judicial notice is taken)." (quotation and citation omitted)).  "Doing so is inconsistent with the established role of the trial court in adversary litigation."  Rokowski, 168 N.H. at 61 (quotation omitted).

"Under New Hampshire Rule of Evidence 201, the circumstances under which a judge may judicially notice a fact are limited."  Id.; see N.H. R. Ev. 201.  Under Rule 201, "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  N.H. R. Ev. 201(a).  Whether subdividing the property before the taking was reasonably probable is not a fact that either is "generally known" or "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Id.

Because there was no evidence that it was reasonably probable that the property could have been subdivided before the taking, thereby rendering the residential lot separate and saleable, there was no support for the trial court's finding that the lot's "before taking" value was $190,000, the same as its "after taking" value under the sales comparison approach.  See Boyle, 172 N.H. at ___ (slip op. at 11).

To the extent that the trial court determined that, before the taking, Torromeo would have been entitled to a waiver from the subdivision regulations, as a matter of law, its determination is similarly without basis in

9

the record.  The Town's subdivision regulations allow the planning board to waive specific regulatory requirements only if "[s]trict conformity would pose an unnecessary hardship to the applicant and waiver would not be contrary to the spirit and intent of the regulations" or "[s]pecific circumstances relative to the subdivision, or conditions of the land . . . , indicate that the waiver will properly carry out the spirit and intent of the regulations."  Plaistow, N.H., Subdivision Regulations art. II, § 235-11(A) (2018).  No evidence was admitted with respect to those waiver requirements during the bench trial.

Torromeo urges us to uphold the trial court's order on alternative grounds.  See Sherryland v. Snuffer, 150 N.H. 262, 267 (2003) ("When a trial court reaches the correct result, but on mistaken grounds, this court will sustain the decision if there are valid alternative grounds to support it.").  Torromeo contends that the trial court's decision that the residential lot did not increase in value as a result of the taking is supportable, even if its reasoning is not.

According to Torromeo, the trial court decided that the value of the residential lot did not increase as a result of the taking "by using the income-based approach to property appraisal."  In fact, the trial court used the sales comparison approach to determine the fair market value of the residential lot before and after the taking.  See Choquette v. Roy, 167 N.H. 507, 513 (2015) ("The interpretation of a trial court order is a question of law, which we review de novo.").  Indeed, neither expert used the income capitalization approach to value the residential lot after the taking.  The State's expert chose not to use that approach because it assumed that the residential lot would be sold after the taking; Torromeo's expert used the approach, but did not give separate values for the industrial and residential lots under that approach, and gave no weight to the approach in his final calculations.

Contrary to Torromeo's assertions, the fact that the trial court found that "[t]here has been no change [to] the rental income" generated from the residential lot as a result of the taking, is not dispositive with regard to whether the residential lot changed value.  As the State correctly observes, the actual rent charged to occupy the residence does not necessarily equate to the fair market value of the residence.  See Ventas Realty Limited Partnership v. City of Dover, 172 N.H. ___, ____ (decided January 10, 2020) (slip op. at 5) (trial court faulted expert for failing to explain how property's actual income and expenses compare to market rates when relying upon actual income and expenses under the income capitalization approach).

Even if there were evidence in the record from which the trial court could have found that, under the income capitalization approach, the fair market value of the residential lot remained the same, before and after the taking, we could not affirm the trial court on that basis.  The trial court did not make that finding, and we could affirm on that basis only if we could say that it

necessarily would have made that finding as a matter of law.  Cf. State v. Hayward, 166 N.H. 575, 583 (2014) ("When, as in this case, a discretionary decision is at issue and the trial court has not exercised that discretion, we may sustain the trial court's ruling on a ground upon which it did not rely only if there is only one way the trial court could have ruled as a matter of law." (quotation omitted)).

Because we cannot discern how the trial court would have ruled had it not found that the residential lot could have been a separate, saleable lot both before and after the taking, and because we are unable to determine, as a matter of law, the "before taking" and "after taking" value of that lot, we vacate the trial court's award of condemnation damages to Torromeo and remand for further proceedings consistent with this opinion.  See Turner v. Shared Towers VA, LLC, 167 N.H. 196, 204 (2014) (deciding that, because we could not determine how the trial court would have ruled upon a particular issue had it not mistakenly relied upon an equitable theory of relief, and because resolving the issue required further fact finding, we vacated this portion of the trial court order and remanded for further proceedings).

Vacated and remanded.

BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred.